128

THE STATE OF OHIO, APPELLEE, *v.* BUCKLEY ET AL., D. B. A. BUCKLEY'S AUTO WRECKING, APPELLANTS; SAXBE, ATTORNEY GENERAL, APPELLEE, ET AL.

(No. 68-5—Decided December 31, 1968.)

*Mr. James V. Barbuto,* prosecuting attorney, and *Mr. William R. Moore, Jr.,* for plaintiff-appellee.

*Messrs. Wyner & Wyner* and *Mr. Milton H. Wyner,* for appellants.

*Mr. Wiliam B. Saxbe,* attorney general, and *Mr. Robert D. Macklin,* for defendant-appellee.

BROWN, J. The relevant provisions of Sections 4737.05 to 4737.99, Revised Code, provide as follows:

Section 4737.05. "As used in Sections 4737.05 to 4737.11, inclusive, of the Revised Code:

"'* * *

"(B) 'Junk yard' means an establishment * * * other than an establishment having facilities for processing iron, steel, or non-ferrous scrap and whose principal product is scrap iron and steel or non-ferrous scrap for

sale for remelting purposes, which is maintained or operated for the purpose of storing, keeping, buying, or selling junk, or for the maintenance or operation of an automobile graveyard * * *.

"(C) 'Fence' means an enclosure at least six feet in height, constructed of non-transparent material, and maintained so as to obscure the junk in the enclosure from the ordinary view of persons passing upon the state, county, and township roads in this state."

Section 4737.07. "No person shall operate and maintain a junk yard outside of a municipality without first obtaining a license to do so from the county auditor * * *. Any person operating or maintaining a junk yard within one thousand feet of a state or county road or within three hundred feet of a township road, prior to January 1, 1964, shall have one year thereafter to erect the required fence if such junk yard is not obscured by natural objects. * * * "* * *

"Any license * * * issued under this section may be revoked by the county auditor * * * after reasonable notice and opportunity to be heard, for any violation of Sections 4737.01 to 4737.11, inclusive, of the Revised Code * * *."

Section 4737.10. "Twice annually the sheriff of each county shall inspect every junk yard that is located within his jurisdiction and for which a license has been issued * * * to obtain information with regard to whether the licensee's business has been and is being conducted in accordance with Sections 4737.01 to 4737.11, inclusive, of the Revised Code. The sheriff shall submit a written report of each such examination to the county auditor of the county wherein such junk yard is located."

Section 4737.11. "Whenever the prosecuting attorney of any county or the Attorney General is of the opinion that a junk yard is being operated or maintained in violation of any of the provisions of Sections 4737.05 to 4737.11, inclusive, of the Revised Code, he may apply, in the name of the state, to a court of competent jurisdiction, alleging the violation complained of and praying for an injunction or other proper relief. In such a case the court may order

such junk yard abated as a nuisance or make such other order as may be proper. * * *"

Section 4737.99. "(A) Whoever violates Sections 4737.01 to 4737.11, inclusive, of the Revised Code, shall be fined not less than twenty-five nor more than one thousand dollars and the costs of prosecution."

The appellants' auto wrecking business has been in operation since 1947. State, county, or township roads run directly beside the yard on three sides. Subsequent to the enactment in 1964 of the junk yard statutes, the appellants erected a six-foot fence around their entire yard. They thereafter received yearly licenses. The prosecuting attorney brought this action under statutory language requiring junk yards to be operated in accordance with the junk-yard statutes, which statutes authorize action for injunction, or other relief at any time when he is of the opinion that the junk-yard statutes are being violated.

The alleged violation involved both the stacking of junk cars, so that they extended above the six-foot fence and were visible to persons on two of the highways involved, and the placing of junk cars in areas within the enclosure which were not effectively obscured by the fence because one of the highways was elevated above the junk-yard area.

The primary question here is whether aesthetic considerations may support such an exercise of the police power.

In *Ghaster Properties* v. *Preston,* 176 Ohio St. 425, which upheld statutes prohibiting certain types of highway billboards, Chief Justice Taft spoke for the court in deciding that the general welfare of the public includes more than public health, safety and morals, and that in drafting a statute the General Assembly could properly give weight "to its effect in promoting the comfort, convenience, and peace of mind of those who use the highway by removing annoying intrusions upon that use." In several other states junk-yard statutes similar to those now before us have been held constitutional, in spite of their obvious foundation on aesthetic considerations. See *Jasper* v.

*Kentucky* (Ky.), 375 S. W. 2d 709, and *Farley* v. *Graney,* 146 W. Va. 22, 119 S. E. 2d 833. Concepts of police power change with the times, as pointed out by the following language from *Euclid* v. *Amber Realty Co.,* 272 U. .S 365, 387:

"* * * Regulations, the wisdom, necessity and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise. * * *"

We think that aesthetic considerations can support these statutes, because interference with the natural aesthetics of the surrounding countryside caused by an unfenced or inadequately fenced junk yard is generally patent and gross, and not merely a matter of taste. Certainly the junk yard here, wherein junk cars are stacked so that they are visible many feet above the top of the fence, is patently offensive, and it cannot be effectively argued in this case that the statutes would be unconstitutional as applied, either because the offensiveness in this fact situation is only a matter of taste or because the surrounding area has no aesthetic value to preserve.

We do not hold that these counterarguments could not be persuasive on another set of facts. The legislative regulation of nuisance is in some ways analogous to zoning, as pointed out in *Euclid* v. *Amber Realty Co., supra,* and the determination in any particular case depends upon the facts of the case. The legislation itself may be constitutional, but its application to a given set of facts may be

unconstitutional where the purpose of the act—promotion of the general welfare—would not be furthered, since then there would be no justification for interference with the use of private property. See *Euclid* v. *Amber Realty Co., supra; Nectow* v. *Cambridge,* 277 U. S. 183; and *Nebbia* v. *New York,* 291 U. S. 502, 525.

The connection between the general welfare and the need for regulation of the use of private property must be subject to continuous review by the courts for the purpose of determining whether a limitation of use is justified; that is to say, whether the need for regulation in light of the general welfare has not yet ripened or has waned. In either event, any limitation on the use of private property would not be required by the public welfare, and hence would be unconstitutional. See *Nashville, C. & St. L. Ry.* v. *Walters,* 294 U. S. 405, 415; *Euclid* v. *Amber Realty Co., supra;* and 16 American Jurisprudence 2d 528, Constitutional Law, Section 272.

This holding is not to be construed as a blanket approval of all regulation based upon aesthetics.

Other jurisdictions have gone beyond our holding here and have held that it is within the power of the Legislature to determine that the community should be beautiful. *Berman* v. *Parker,* 348 U. S. 26, 33; *Oregon City* v. *Hartke,* 240 Ore. 35, 400 P. 2d 255. So large a step presupposes an exact definition of beauty which is acceptable to all tastes.

We read the statutes in question as requiring that the fence effectively and substantially hide the cars in the junk yard from the public view contemplated by the statute. No unevenness of terrain which makes this difficult or impossible excuses violation of the statutory requirement. The statutes are neither vague nor uncertain, nor do they contain an unconstitutional delegation of legislative power.

It is argued that the statutes are unconstitutional under the "equal protection" clauses of the Constitutions of the United States (Fourteenth Amendment) and of Ohio (Section 2, Article I) because there is no reasonable basis for exempting scrap yards from the class covered by the statutes.

As pointed out by Chief Justice Taft in *Porter* v. *Oberlin,* 1 Ohio St. 2d 143, 151, equal protection requires that class legislation apply alike to all persons within a class, and that reasonable grounds exist for making a distinction between those within and those without a designated class. Within these limits a legislative body has a wide measure of discretion. *Xenia* v. *Schmidt,* 101 Ohio St. 437; *Benjamin* v. *Columbus,* 167 Ohio St. 103.

It is generally recognized that when a legislative body chooses to act to correct a given evil it need not correct all the evil at once, but it may proceed step-by-step. *Yee Bow* v. *Cleveland,* 99 Ohio St. 269; *Porter* v. *Oberlin, supra,* 152; *Xenia* v. *Schmidt, supra.*

Furthermore, as Justice Holmes said in *Central Lumber Co.* v. *South Dakota,* 226 U. S. 157, 160:

"* * * If a class is deemed to present a conspicuous example of what the legislature seeks to prevent, the Fourteenth Amendment allows it to be dealt with although otherwise and merely logically not distinguishable from others not embraced in the law."

We think that the exemption of scrap yards is neither arbitrary nor unreasonable. Unlike junk yards, which are merely storehouses for junk cars, scrap yards consume the junk cars within their confines, and thus help to alleviate the eyesores of automobile graveyards dotting the countryside. Also, by consuming vehicles, a scrap yard occupies far less space than would a junk yard which stored the number of vehicles the scrap yard handles over a period of time. It may well be that the General Assembly saw fit to exempt scrap processing dealers to stimulate efforts to remove junk instead of store it. Certainly we can not say that junk yards are not a conspicuous example of modern roadside blight.

The judgment of the Court of Appeals is affirmed.

*Judgment affirmed.*

TAFT, C. J., ZIMMERMAN, MATTHIAS and O'NEILL, JJ., concur.

HERBERT and SCHNEIDER, JJ., dissent.

HERBERT, J., dissenting. Section 1, Article I of the Ohio Constitution, in part, provides that:

"All men * * * have certain inalienable rights, among which are those of * * * acquiring, possessing, and *protecting property* * * *." (Emphasis added.)

It is stated in the opinion that:

"* * * No unevenness of terrain which makes this [concealment of a junkyard] difficult or *impossible* excuses violation of the statutory requirements. * * *" (Emphasis added.)

There are many areas in Ohio, particularly in the southern and eastern portions, in the hill country, where it would be impossible to have a junkyard which would comply with the requirements set up in the statutes here under consideration. In other parts of the state there are hundreds of miles of road built upon a grade. An occupant of an automobile on such a road could see over a fence six feet tall and observe, probably, some junked automobiles.

An unwarranted, "sudden death" power is granted to the various county auditors to destroy a great and growing dual industry, *i. e.*, eliminating junked motor vehicles and creating a source of supply for remelting steel. I believe that these statutes invade the constitutional protection above quoted. Furthermore, the development of industrial parks adjacent to municipalities may well be endangered by the enforcement of these statutes, as interpreted by the majority opinion and judgment. This judgment is based solely on the claim that a junkyard in rural areas offends the sense of the aesthetic.

*Youngstown* v. *Kahn Bros. Bldg. Co.*, 112 Ohio St. 654, at page 662 in the opinion, speaks in the words following:

"* * * We are therefore remitted to the proposition that the police power is based upon *public necessity,* and that the *public health, morals, or safety, and not merely aesthetic interest, must be in danger in order to justify its use.*" (Emphasis added.)

Paragraph three of the syllabus in *Wondrak* v. *Kelley,* 129 Ohio St. 268, is as follows:

"*Aesthetic reasons alone,* unrelated to the require-

136

ments of the public health, safety or welfare, will not justify the exercise of the police power.'' (Emphasis added.)

Chapter 4737.05, Revised Code, may tend to interfere with the free exercise of the initiative essential to private enterprise. There may well be healthful competition between scrap yards and junk yards. This legislation weighs heavily against the junk-yard industry, from which its competitor, the scrap-yard industry, is free.

Furthermore, where land otherwise worthless, made valuable by reason of the development of an industry in the collection and sale of junked automobiles, is destroyed by statute, it may be argued that the owners of such industry are entitled to compensation under the provisions of Section 19, Article I of the Constitution of Ohio.