**OHIO UNIVERSITY BOARD OF TRUSTEES et al., Appellees,**

v.

**SMITH, Appellant.**

[Cite as *Ohio Univ. Bd. of Trustees v. Smith* (1999), 132 Ohio App.3d 211.]

Court of Appeals of Ohio,
Fourth District, Athens County.

No. 98CA11.

Decided Feb. 1, 1999.

212

---

*Mollica, Gall, Sloan & Sillery Co., L.P.A.*, and *Robert J. Gall*, Special Counsel, for appellees.

*W. Bailey Barton*, for appellant.

---

HARSHA, Judge.

Roger Smith appeals the Athens County Common Pleas Court's grant of summary judgment in favor of the appellees, the President and Board of Trustees of Ohio University, and assigns the following errors:

"1. The Athens County Court of Common Pleas erred in granting summary judgment when genuine issues of material fact remained unresolved.

"2. The Athens County Court of Common Pleas erred in failing to rule on the substantive state and federal Constitutional question raised by Defendant as an affirmative defense.

"3. The Athens County Court of Common Pleas erred in finding a contract existed between the parties."

In 1983, while a junior in college, Roger Smith applied to the Ohio University College of Medicine ("OUCOM"). He received a secondary application packet from OUCOM that contained the contract involved in this case. Applicants to OUCOM were not required to sign the contract. However, out-of-state students had a better chance of being admitted if they did since Ohio law required that eighty percent of students attending OUCOM be Ohio residents or "nonresidents who have indicated their intention to practice medicine in this state for at least five years after completion of their undergraduate and postgraduate medical training." R.C. 3337.14. Smith testified in his deposition that prior to signing the contract, he contacted OUCOM to ask whether he was required to sign it. He testified that an OUCOM representative implied that if Smith were a white male, he would not be accepted without signing the contract. Smith signed the contract, was admitted, and attended OUCOM until he graduated in 1988. He completed a one-year internship at Cuyahoga Falls General Hospital in June 1989. He was a resident at the Ohio State University Department of Family Medicine from July 1989 to June 1990. From July 1990 to June 1993, Smith was a resident at Harding Hospital in Worthington, Ohio. He then worked as a full-time staff physician from July 1993 to July 1994 at the Southeast Community

Mental Health Center in Columbus, Ohio. In August 1994, Smith began working full-time as a clinical and research fellow at Stanford University in Stanford, California.

In January 1996, OUCOM sent Smith a letter asking him to inform OUCOM of his current educational status and when he expected to complete his five-year commitment. After not hearing from Smith by February 15, 1996, OUCOM again sent Smith a letter inquiring about his intention to complete his five-year commitment. After receiving no response to the second letter, OUCOM filed this action for breach of contract. Smith counterclaimed, but the trial court dismissed the counterclaim, a decision that neither party has challenged on appeal. After both sides moved for summary judgment, the trial court granted appellees' motion.[1]

## I

Because the judgment was issued under Civ.R. 56, we will apply the summary judgment standard of review to all assignments of error. In reviewing a summary judgment, the lower court and the appellate court utilize the same standard, *i.e.*, we review the judgment independently and without deference to the trial court's determination. *Midwest Specialties, Inc. v. Firestone Co.* (1988), 42 Ohio App.3d 6, 8, 536 N.E.2d 411, 413–414. Summary judgment is appropriate when the following have been established: (1) that there is no genuine issue as to any material fact, (2) that the moving party is entitled to judgment as a matter of law, and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence construed most strongly in its favor. *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 146, 524 N.E.2d 881, 883–884; cf., also, *State ex rel. Coulverson v. Ohio Adult Parole Auth.* (1991), 62 Ohio St.3d 12, 14, 577 N.E.2d 352, 353–354; Civ.R. 56(C). The burden of showing that no genuine issue exists as to any material fact falls upon the moving party in requesting summary judgment. *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 115, 526 N.E.2d 798, 801–802. Additionally, a motion for summary judgment forces the nonmoving party to produce evidence on any issue for which (1) that party bears the burden of production at trial, and (2) for which the moving party has met its initial burden. See *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 662 N.E.2d 264; *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570

---

1. The journal entry at issue does not explicitly overrule appellant's cross-motion for summary judgment, but by granting appellees' motion for summary judgment, the trial court implicitly did so. See *State ex rel. Wright v. Ohio Adult Parole Auth.* (1996), 75 Ohio St.3d 82, 86, 661 N.E.2d 728, 731–732.

N.E.2d 1095, paragraph three of the syllabus; and *Stewart v. B.F. Goodrich Co.* (1993), 89 Ohio App.3d 35, 623 N.E.2d 591.

First, we consider Smith's third assignment of error, in which he argues that there is no contract between the parties.

The contract provided:

"1. The applicant agrees that in consideration of admission to the College of Medicine and for the medical education to be provided by the College of Medicine he/she will become licensed and practice medicine in the State of Ohio for a period of at least five (5) years from the date of completion of both undergraduate and post graduate medical education, with the date of completion to be determined by the College of Medicine.

" * * *

"3. The applicant agrees that in the event of his/her breach of this contract of admission for failure to fulfill the terms and condition contained in paragraph 1 above and upon failure to fully correct this breach within a reasonable time set by notice given the College of Medicine, the Attorney General of the State of Ohio, the Board of Regents, Ohio University, or any authorized representative of the College of Medicine, the applicant shall pay to the College of Medicine for its use and benefit as liquidated damages, the total sum of the then existing subsidized costs, at the time of breach for the College of Medicine to provide medical education to one medical student to be determined by accepted accounting methods by the College of Medicine, further, the applicant agrees that he/she will pay to the College of Medicine the amount of liquidated damages within thirty (30) days after official notice of the breach and the specific amount of liquidated damages, and that he/she will be responsible for all costs, including attorneys fees, if the College of Medicine or other agency or instrumentality of the State of Ohio must commence litigation to recover the liquidated damages. Further, the applicant agrees that he/she will annually notify the College of Medicine according to its prescribed procedures whether he/she is fulfilling the obligations as set forth by this contract of admission."

## A

Smith advances three reasons why no contract exists. First, he contends that the agreement between the parties fails because "it does not reflect the manifest intentions of the parties." He argues that he did not understand his obligations under the contract, but signed it anyway. We presume that the language of a contract between competent persons accurately reflects their intentions. *Fairway Manor, Inc. v. Bd. of Commrs. of Summit Cty.* (1988), 36

Ohio St.3d 85, 521 N.E.2d 818; *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph one of the syllabus.

■ Smith argues that he was "incompetent" to contract because he was not financially able to retain legal counsel to explain the contract to him and he did not have experience in legal matters. He concludes that since he was incompetent, he could not understand the terms of the contract and there was no mutuality. The trial court concluded that Smith did not raise the competency issue. Nonetheless, we will discuss it briefly.

■ Normally, an incapacity to contract results from mental incapacity or illiteracy. See, *e.g., Cuyahoga Cty. Hosp. v. Price* (1989), 64 Ohio App.3d 410, 581 N.E.2d 1125. There is no evidence that Smith was illiterate or unable to comprehend the contract when he signed it. Financial inability to hire legal counsel or legal inexperience does not make a person incompetent to contract. Therefore, there is no genuine issue of material fact concerning Smith's competency.

■■ Furthermore, the contract is not void for a lack of mutuality. The signing of an agreement and acquiescence in its effect may demonstrate a meeting of the minds where the signatory is able to read and comprehend the agreement. See *McAdams v. McAdams* (1909), 80 Ohio St. 232, 88 N.E. 542; *Cuyahoga Cty. Hosp. v. Price* (1989), 64 Ohio App.3d 410, 581 N.E.2d 1125; *Campco Distrib., Inc. v. Fries* (1987), 42 Ohio App.3d 200, 537 N.E.2d 661. Smith does not assert that he was unable to read or comprehend the agreement; rather, he asserts that he had a different understanding of key terms in the contract. Further, Smith acquiesced in the contract's effect by accepting OUCOM's consideration, *i.e.,* admission into OUCOM and practicing medicine in Ohio for at least a year. Therefore, the trial court was correct in finding that appellant had failed to present a genuine issue of material fact concerning mutuality.

B

■ Next, Smith argues that the contract was void because OUCOM committed "constructive fraud." Fraud is an affirmative defense upon which appellant carries the burden of proof at trial. See Civ.R. 8(C). Smith asserts that the relationship between OUCOM and Smith is fiduciary or special in nature because it is a student-educator relationship. He claims that the existence of this relationship creates special duties for OUCOM. The contract resulted from a relationship between an educational institution and a prospective student, rather than a relationship between an educator and a student. In order for constructive fraud to exist, the parties must have "special confidential or fiduciary relation." See *Hanes v. Giambrone* (1984), 14 Ohio App.3d 400, 14 OBR 518, 471 N.E.2d 801

(partnership); *Liming v. Liming* (Oct. 22, 1998), Adams App. No. 98CA657, unreported, 1998 WL 743903 (marital relationship). Appellant cites absolutely no authority to support his conclusion that there is a special or fiduciary relationship between an educational institution and a prospective student and we decline to create one. We find no error in the trial court's judgment in this regard.

The essence of appellant's argument seems to be that the contract was unconscionable, *i.e.*, that it was a contract of adhesion. Unconscionability is a question of law. *Ins. Co. of N. Am. v. Automatic Sprinkler Corp.* (1981), 67 Ohio St.2d 91, 98, 21 O.O.3d 58, 62, 423 N.E.2d 151, 155–156.

" 'Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' *Williams v. Walker–Thomas Furniture Co.* (C.A.D.C.1965), 350 F.2d 445, 449. A contract is unconscionable if it did not result 'from real bargaining between parties who had freedom of choice and understanding and ability to negotiate in a meaningful fashion.' *Kugler v. Romain* (1971), 58 N.J. 522, 544, 279 A.2d 640, 652. The crucial question is whether 'each party to the contract, considering his obvious education or lack of it, [had] a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print * * *?' *Williams, supra* at 449." *Lake Ridge Academy v. Carney* (1993), 66 Ohio St.3d 376, 383, 613 N.E.2d 183, 189.

There was no absence of a meaningful choice on Smith's part. The contract itself contained a place to sign if the student wished to be considered for admission without being required to work in Ohio. Furthermore, Smith was free to apply to other medical schools in Ohio and elsewhere. The contract as a whole in this case is not unconscionable. Smith was a junior in college when he signed the contract. The parties appear to have dealt with each other at arm's length and there is no evidence of coercion or duress. The damages clause is printed on the contract in the same print size as the other clauses; it is legible and in plain English. In short, we see no evidence that Smith was pressured into signing a contract the terms of which he could not easily see and understand. There being no genuine issue of material fact, the contract at issue is not unconscionable as a matter of law.

C

Lastly, appellant argues that there is no contract because the essential terms of the contract are so vague and ambiguous there could be no meeting of the minds. This is essentially the same argument we rejected above. He asserts that the term "post-graduate medical education" is vague and ambiguous.

When the terms of a contract are unambiguous, courts look to the plain language of the document and interpret it as a matter of law. *Latina v. Woodpath Dev. Co.* (1991), 57 Ohio St.3d 212, 214, 567 N.E.2d 262, 264–265; *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus. Extrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning. *Shifrin v. Forest City Ent., Inc.* (1992), 64 Ohio St.3d 635, 638, 597 N.E.2d 499, 501–502.

Smith does not dispute that in actuality that a "post-graduate medical education" consists of a medical degree, internship and residency; rather, he argues that he believed at the time he signed the contract that it meant only "medical school." He concludes that the term is vague because he thought it had a different meaning. His subjective interpretation of the term "post-graduate medical education" does not create a genuine issue of material fact concerning the meaning of this term of art. Dr. Frank Myers testified in his deposition that the obligation to practice medicine begins "when they have finished the training programs generally referred to as internship, residency, possibly fellowship, although most of us do not take fellowship." Smith listed his internship and two residencies when asked to "give the dates, places and addresses of all internships, residencies, fellowships, or. *other post-graduate medical education* you have received since graduating from [OUCOM]." Furthermore, in his application for his Stanford fellowship, Smith listed his residencies and internship under the "postgraduate" heading of "education" and did not list anything under the "graduate, non-medical" heading of "education." Appellant presented no Civ.R. 56 materials that purported to define "post-graduate medical education." Rather, he asserted in his deposition that he believed that it meant only medical school when he signed the contract. Construing the Civ.R. 56 materials in the light most favorable to appellant, there is no genuine issue of material fact that "post-graduate medical education" means anything other than a medical degree, residency, and internship.

We overrule appellant's third assignment of error because we have found no merit in any of his arguments.

## II

We now turn to appellant's first assignment of error in which he argues that the trial court erred in granting summary judgment because genuine issues of material fact remained, *i.e.*; (1) the date of breach, (2) whether appellees gave him the notice required by the contract, and (3) the amount of damages.

## A

First, appellant argues that there is a genuine issue of material fact as to when a breach of the contract occurred. He asserts that he did not breach the contract until after appellees filed its complaint because he was participating in a fellowship at Stanford, not "practicing medicine."

Smith agreed to become licensed in Ohio and practice medicine in Ohio for at least five years "from the date of completion of both undergraduate and post-graduate medical education." Smith argues that he was not in breach of the contract when appellees filed their complaint because he was in a fellowship. Implicit in his argument is that Smith had not completed his postgraduate medical education because his fellowship is a continuation of his post-graduate medical education. However, see our discussion in (C) above.

Smith breached the contract when, after completing his post-graduate medical education, he ceased practicing medicine in Ohio to reside in California. He completed his residency in June 1993 and then began to practice medicine as a staff physician at Southeast Community Mental Health Center. He left the practice of medicine in Ohio in July 1994 to assume a fellowship in California. The fact that he resumed his medical education after the breach is irrelevant.

Smith also argues that the appellees would have dismissed this lawsuit had Smith agreed to return to Ohio, as evidence that the breach occurred after he finished his fellowship and refused to return to Ohio. Appellees' offer to waive Smith's breach does not change the fact that Smith breached the contract. There is no genuine issue of material fact concerning the date of appellant's breach.

## B

Appellant argues that OUCOM breached the contract by not giving Smith the notice required in Paragraph 3 of the contract. He asserts that the letters sent by OUCOM in January and February 1996 cannot constitute notice because he had not breached the contract at that time. Since we have already determined that Smith had breached the contract before the letters were sent, we reject this argument. Second, he asserts that there is no proof that appellant actually received the letters sent by OUCOM. In his deposition, appellant testified that he was living at the address where the letters were sent. A representative of OUCOM stated in an affidavit that OUCOM did not receive the letters back. Furthermore, appellant became aware of the consequences of a breach when he and his attorney inquired about "buying out" his contract in 1992. Thus, even if Smith did not receive OUCOM's letters, he had actual notice of the consequences of his breach. We reject this argument.

## C

Appellant argues that the trial court erred in failing to construe paragraph three of the contract concerning how damages are to be calculated and that genuine issues of material fact remain as to the amount of damages that should be awarded. Although the trial court did not expressly construe this portion of the contract, implicit in its decision is that the damages should be calculated by the "subsidized cost" of educating one student at OUCOM. Appellant argues that the measure of damages should take into consideration the actual cost of educating a student, which includes all revenues generated by OUCOM, such as tuition. The "subsidized costs" of an education are different than the "actual cost" of an education.

The contract specifies that damages will be calculated using "the then existing subsidized cost." Furthermore, attached to appellee's motion for summary judgment was an affidavit of Gary O. Moden, Associate Provost of Ohio University. Moden is the principal financial advisor to Ohio University's provost. He stated that the most reasonable way to determine the cost of an OUCOM education in accordance with acceptable accounting methods is to divide OUCOM's fiscal year instructional subsidy by the number of OUCOM students and multiply it by the years at OUCOM. He illustrates this by stating that a breach during the 1991–1992 school year is figured by dividing the Instructional Subsidy of $8,482,007 by the number of students, four hundred two, to get $21,100 per student, per year. This amount is then multiplied by the number of years at OUCOM, four, to get $84,400. Appellant then receives an amount equal to one-fifth of the liquidated damages as credit, because he practiced medicine in Ohio for one out of the five years required. This leaves $67,520 as the amount of liquidated damages. There is no genuine issue of material fact involved in this calculation. The damages are determined by applying undisputed amounts to the formula provided in the contract. Thus, the trial court did not err in awarding $67,520 in liquidated damages to OUCOM in its summary judgment.

## III

We now turn to appellant's second assignment of error, in which he argues that the trial court erred by failing to rule on his allegations that R.C. 3337.14 and the contract violate the Equal Protection Clauses of the Ohio and United States Constitution. Although we would have preferred the trial court to have explicitly addressed appellant's constitutional arguments in its entry, we presume that it considered and rejected appellant's arguments. Cf. *State v. Whaley* (Mar. 25, 1997), Jackson App. No. 96CA779, unreported, 1997 WL 142711 (when a trial court fails to rule on a motion, we presume that it overruled the motion.) In any event, we address the constitutionality issues *de novo*.

The limit placed upon governmental action by the Equal Protection Clauses of the Ohio and United States Constitutions are nearly identical. *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 633 N.E.2d 504. If there is no fundamental right or suspect classification at issue, courts apply a rational basis level of scrutiny. *Granzow v. Montgomery Cty. Bur. of Support* (1990), 54 Ohio St.3d 35, 560 N.E.2d 1307. Courts will uphold the statute if it bears a rational relationship to a legitimate governmental interest. *Fahnbulleh v. Strahan* (1995), 73 Ohio St.3d 666, 653 N.E.2d 1186; *Adamsky v. Buckeye Local School Dist.* (1995), 73 Ohio St.3d 360, 653 N.E.2d 212; *Fabrey v. McDonald Village Police Dept.* (1994), 70 Ohio St.3d 351, 353, 639 N.E.2d 31, 33–34. Thus, the Equal Protection Clause does not prevent the state from distinguishing between classes of persons. Rather, it prevents the state from invidiously discriminating against one classification in favor of a similarly situated classification. *Andres v. Perrysburg* (1988), 47 Ohio App.3d 51, 546 N.E.2d 1377. If a fundamental right or suspect classification is at issue, courts will apply a strict scrutiny, rather than the rational basis test. See, *e.g., Larson v. Valente* (1982), 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33.

Appellant makes a facial challenge against R.C. 3337.14 and also argues that OUCOM's application of R.C. 3337.14 violates his right to equal protection. A facial attack on the constitutionality of a statute is to be decided by considering the statute without regard to extrinsic facts. *Cleveland Gear Co. v. Limbach* (1988), 35 Ohio St.3d 229, 231, 520 N.E.2d 188, 191. An "as applied" attack on the constitutionality of a statute is to be decided by considering the facts. The burden is upon the party making the attack to present clear and convincing evidence of a presently existing state of facts that makes the statute unconstitutional when applied to the state of facts. *Id.,* citing *Belden v. Union Cent. Life Ins. Co.* (1944), 143 Ohio St. 329, 28 O.O. 295, 55 N.E.2d 629, paragraph six of the syllabus.

## A

First appellant argues that R.C. 3337.14 on its face creates a discriminatory classification between nonresident doctors and resident doctors. R.C. 3337.14 provides:

"Educational programs of the Ohio university college of osteopathic medicine shall emphasize the training of osteopathic doctors who will engage in the family practice of medicine. The college shall encourage its graduates to practice medicine in those areas of the state where the greatest need exists for osteopathic physicians. Eighty percent of the students enrolled at any time in the college shall be either Ohio residents or nonresidents who have indicated their intention to practice medicine in this state for at least five years after completion of their

undergraduate and post graduate medical training. Such indication of intent shall be made in writing in accordance with procedures adopted by the board of trustees of the university."

This statute classifies students in terms of their residency. Nonresident students within the eighty-percent requirement by R.C. 3337.14 must indicate their intent to practice in Ohio for five years after they complete their postgraduate medical training. Appellant claims that this classification infringes upon his right to travel. The right to travel from state to state has long been recognized as a basic right under the Constitution. *Dunn v. Blumstein* (1972), 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274. Differing standards have been applied in reviewing equal protection challenges where the right to travel is involved. Strict scrutiny has been used when newcomers to a state have been deprived of vital benefits, such as welfare or voting. See *Shapiro v. Thompson* (1969), 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (states may not deny welfare benefits on the basis that the recipient has resided in the state for less than a year); *Dunn, supra* (state may not prohibit a resident from voting on the basis that he has not been present in the district for one year). Rational based scrutiny has been applied in other situations. See *State ex rel. Brown v. Summit Cty. Bd. of Elections* (1989), 46 Ohio St.3d 166, 545 N.E.2d 1256 (effects of a two-year durational residency requirement for city council candidates on right to travel is so minimal that rational basis scrutiny is applied).[2] We review a university's classification of students as residents and nonresidents for violations of the equal protection clause under a rational basis test. *Kelm v. Carlson* (C.A.6, 1973), 473 F.2d 1267; *Eastman v. Univ. of Michigan* (C.A.6, 1994), 30 F.3d 670. A state may provide education for its own residents on a preferential basis. *Eastman,* citing *Vlandis v. Kline* (1973), 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63. Thus, the question before us is whether R.C. 3337.14's classification rationally advances a legitimate state interest.

R.C. 337.14 sets forth one possible legitimate governmental interest, *i.e.,* training osteopathic doctors to serve the people of Ohio. A rational way to achieve this goal is to require eighty percent of students enrolled at OUCOM to be residents or nonresidents who have indicated an intent to practice medicine in Ohio for five years. There is a rational basis for not requiring the same commitment from residents because their residency indicates that they may be less likely to leave the state after finishing their medical education. Thus, the classification is rationally related to a legitimate governmental interest and does not violate the Equal Protection Clause.

---

**2.** For a more thorough discussion of the differing standards applied in right-to-travel cases, see *Maldonado v. Houstoun* (C.A.3, 1998), 157 F.3d 179.

B

 Next, appellant argues that OUCOM's application of the statute, *i.e.,* the contract, violates the Equal Protection Clause. He asserts that OUCOM, through the contract, has not strictly complied with R.C. 3337.14. Specifically, he complains that the contract does not require him to practice family medicine in an area in the greatest need of osteopathic physicians. R.C. 3337.14 does not mandate that OUCOM require nonresidents to practice family medicine in an area in the greatest need of osteopathic physicians; rather, it directs OUCOM to "emphasize" family practice in training the students and to "encourage" its students to practice in an area in the greatest need of osteopathic physicians. Moreover, whether the state's classification best achieves its interest is not relevant. Rather, we uphold the state's action unless the classification is wholly irrelevant to achievement of the governmental interest. *Menefee v. Queen City Metro* (1990), 49 Ohio St.3d 27, 550 N.E.2d 181 citing *McGowan v. Maryland* (1961), 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393. Requiring nonresident students to practice medicine in Ohio is a first step in having more family practitioners in those areas in the greatest need of them. The state is not required to implement programs to correct a problem all at once; to the contrary, they may proceed step by step. *New Orleans v. Dukes* (1976), 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511; *Am. Assn. of Univ. Professors v. Cent. State Univ.* (1998), 83 Ohio St.3d 229, 699 N.E.2d 463 citing *State v. Buckley* (1968), 16 Ohio St.2d 128, 45 O.O.2d 469, 243 N.E.2d 66. Thus, R.C. 3337.14 neither on its face nor as applied violates appellant's equal protection rights. We overrule appellant's second assignment of error.

IV

In sum, we have overruled all of appellant's assignments of error and affirm the judgment of the trial court.

*Judgment affirmed.*

PETER B. ABELE and KLINE, JJ., concur.