**BARNES, Appellant,**

v.

**RICOTTA et al., Appellees.**

[Cite as *Barnes v. Ricotta* (2001), 142 Ohio App.3d 560.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 77287.

Decided May 7, 2001.

*Richard G. Johnson,* for appellant.

*Reminger & Reminger, George S. Coakley* and *Brian D. Sullivan,* for appellee John Ricotta.

*Gallagher, Sharp, Fulton & Norman, Michael A. Ross, Timothy T. Brick* and *Alton L. Stephens,* for appellee John A. Ghazoul.

PATRICIA ANN BLACKMON, Judge.

This appeal raises the issue whether triable issues of fact remain to be litigated in a legal malpractice case between an attorney and his client where the attorney admits the malpractice and negotiates a settlement with the client.

Appellant Jennifer Barnes appeals the trial court's granting of summary judgment in favor of attorneys John J. Ricotta and John A. Ghazoul, wherein the trial court held as a matter of law that Barnes had executed a valid release of liability as to both lawyers. Barnes assigns the following error for our review:

"The trial court erred when on or about October 27, 1999, it granted the defendants' motion for summary judgment, docket No. 41 & 42, Vol. 2394, pg. 588."

Having reviewed the record and the legal arguments of the parties, we reverse and remand to the trial court for further proceedings consistent with this opinion.

Jennifer Barnes sustained injuries when Joan Gentile, a drunk driver, struck Barnes as she stood in a friend's driveway. Barnes's employer referred her to attorney John A. Ghazoul. Ghazoul referred Barnes to attorney John J. Ricotta. Ricotta failed to file the personal injury suit within the required period of the statute of limitations. However, he did file the complaint which claimed both personal injury and emotional distress.

State Farm, representing its insured Joan Gentile, moved for partial summary judgment on the personal injury claim, which the trial court granted. After the summary judgment, Ricotta spoke with Barnes and admitted that he had committed legal malpractice in not filing the personal injury claim timely. He explained to her that State Farm had offered $25,000 to settle the emotional-distress claim. Ricotta also told her that she could sue him. During the discussion, Ricotta proposed that she could agree to $25,000 from State Farm and that he would pay her medical bills and waive his fee and money that she owed him. However, the consideration offered in the form of payment of medical bills and of waiver of money owed to him were not mentioned in the release.

The release, which purports to release Gentile, Ricotta, Ghazoul, and State Farm, states that the consideration is $25,000 and that that sum is the sole consideration for the release. The $25,000 mentioned in the release is apparently the same $25,000 Barnes received from State Farm. Further, it states that "this release contains the entire agreement between the parties," and that "no promise or inducement has been offered or made except as herein set forth." Ricotta did not give Barnes the $25,000 until after she signed the release.

On November 23, 1997, Barnes received the release, and on the following Monday she signed it. In the interim, she spoke with her employer, Dr. Borys Pakush, with an attorney friend of Pakush, Mike Dibronis, whom she did not retain, and with her father. At her deposition, the following discourse took place regarding these various conversations:

"Q. Did you talk to anybody about Exhibit 3 after you received it from Rand and before you signed it at Dunkin Dougnuts? [*Sic.*]

"A. Yeah, I talked to my boss about it. Just because he had told me before that I had every right to sue him, I did not think that that held any grounds for the fact that there was a malpractice suit, that I could put a malpractice suit against him.

"Q. And tell me about your conversation with Dr. Pakush about Exhibit 3.

"A. I just asked him if he felt that it was—if it was relevant, if it held any grounds, because John Ricotta had already told me that he screwed up my case

and that I had every right to sue him, and just basically we both kind of just—it was just somebody to talk to to see if they agreed with me, that I didn't think it held any ground if I wanted to put a malpractice suit against him.

"Q.  Did you talk to any lawyer in between the Friday and the Monday when you signed the document at Dunkin Doughnuts?  [*Sic.*]

"MR. JOHNSON:  Objection.  You can answer.

"A.  Okay.  Yes, I did.

"Q.  And who did you talk to?

"A.  Mike Dibronis.

"Q.  Mike Dibronis?

"A.  Yeah.  I don't—

"Q.  Who is Mike Dibronis?

"A.  He is my boss' best friend, happened to be at the animal hospital.

"Q.  He is Dr. Pakush's best friend?

"A.  Right.  I did not retain him—

"Q.  Okay.  And—

"A.  —as a lawyer.

"Q.  And he was—he happened to be at the West Park Animal Hospital on Friday?

"A.  Yes.

"Q.  And you discussed this proposed release of all claims with Mike Dibronis?

"A.  I just showed it to him.

"Q.  What did you tell him at the time you showed it to him?

"A.  What John Ricotta had said to me.

"Q.  Did he know John Ricotta?

"A.  No, he did not.

"Q.  And did you ask Dibronis what he thought of the release of all claims?

"A.  Yes, I did.

"Q.  And what did he tell you?

"A.  He didn't think it held any ground either.  He did not think it held any ground.

"Q.  Did you talk to anybody else about this release of all claims other than Dr. Borys, Pakush and Mike Dibronis?

"A.   My father.

"MR. JOHNSON:  During that three day interval?

"Q.   Yes, in between the Friday and the Monday.

"A.   My father.

"Q.   And what is your dad's name?

"A.   Hal Barnes.

"Q.   What did your father think?

"A.   Same thing, just that it didn't—it wasn't—it didn't make sense for him to say to me that you can sue me and then turn around and ask me to sign a release form.

"Q.   Did you talk to anybody else?

"A.   No, I did not.

"Q.   When did you decide to sign Exhibit 3 for the first time?

"A.   Monday morning.

"Q.   And did you sign it in the presence of Rand?

"A.   Yes, I did."

From what we can glean from her deposition testimony, Barnes did not believe that the release prevented her from maintaining the lawsuit against Ricotta and Ghazoul.

Indeed, on October 13, 1998, Barnes filed a complaint against Ricotta and Ghazoul alleging legal malpractice.  In May 1999, the two defendants filed motions for summary judgment, asserting that Barnes' claim is barred because of the release.  The court granted both summary judgment motions, stating that issues of disciplinary violations are solely within the discretion of the Ohio Supreme Court.

On appeal, Barnes urges that the trial court erred when it granted summary judgment because the release is presumptively void and because genuine issues of material fact exist.

Civ.R. 56(C) states:

"Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Further, the court in *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 662 N.E.2d 264, stated:

"[A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. * * * If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden * * * to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party."

In *Vahila v. Hall* (1997), 77 Ohio St.3d 421, 674 N.E.2d 1164, the court held:

"[T]o establish a cause of action for legal malpractice based on negligent representation, a plaintiff must show (1) that the attorney owed a duty or obligation to the plaintiff, (2) that there was a breach of that duty or obligation and that the attorney failed to conform to the standard required by law, and (3) that there is a causal connection between the conduct complained of and the resulting damage or loss."

"[T]his rule places an attorney on notice that when a client has a potential cause of action for malpractice, the attorney and client are adversaries. Because the attorney-client relationship places the attorney in a position of dominance, courts and professional ethics committees have said that a potential malpractice claim may be settled only if the client consents after full disclosure, the settlement is not unconscionable, inequitable, or unfair, and, most important, the client is advised to seek independent counsel before signing the agreement." See, also, *Disciplinary Counsel v. Clavner* (1997), 77 Ohio St.3d 431, 674 N.E.2d 1369.

Ricotta had an obligation to fully disclose the malpractice. Here, he told Barnes that he had "screwed up" by failing to timely file her personal injury claim and that she could sue him. We are satisfied that he fully disclosed his malpractice.

We further conclude that Ricotta satisfied the *Clavner* requirement of advising the client to seek independent counsel. We acknowledge that he did not use the exact language "independent counsel," but he did advise her to discuss the matter with "her father, her friends or her attorney." She did speak to her employer, an attorney, and her father. *Clavner* does not require that she receive good or

accurate or adequate advice from an independent counsel, only that her lawyer advise her to seek independent counsel. She did seek counsel from three persons; consequently, we are satisfied that Ricotta fulfilled that portion of *Clavner.*

However, our concern is with the second prong of *Clavner. Clavner* holds that the settlement must not be unconscionable, inequitable, or unfair. The settlement in this case is contained in the release. A release is a contract that requires an offer, acceptance, and consideration like any other contract. *Noroski v. Fallet* (1982), 2 Ohio St.3d 77, 79, 2 OBR 632, 633–634, 442 N.E.2d 1302, 1304. In *Manning v. Brucato* (Jan. 23, 1986), Cuyahoga App. No. 49361, unreported, 1986 WL 1062, this court examined a similar issue regarding consideration. In that instance, the release indicated that the consideration included mutual relinquishment of legal rights of the parties, payment of various sums listed, and the execution of a promissory note. The court stated:

"Such consideration was clearly adequate. The law relating to releases is well settled. There is a distinction between the sufficiency of consideration for a release and its adequacy. So long as the consideration is valuable it does not become insufficient merely because it may not be adequate."

In his deposition, Ricotta stated that part of the consideration was that he agreed to waive his attorney fees and to pay Barnes's medical bills. However, these conditions were never incorporated into the written release that Barnes signed. Because a release is a contract, the court is bound to look within the four corners of the contract and, in this case, cannot look to extraneous matters for interpretation. The release recited as the consideration only the payment of $25,000. Therefore, it is understandable that Barnes did not believe that this release would bar any malpractice suit she wished to bring; it referred only to the $25,000 she had already obtained from State Farm. Ricotta cannot use the same sum of money secured to release State Farm and Gentile to release himself because the $25,000 concerns only State Farm, Gentile, and Barnes. Consequently, we conclude that the release cannot be used to settle Barnes's malpractice against Ricotta and Ghazoul because the $25,000 constituted money owed to Barnes by State Farm's insured. Since the $25,000 is the only consideration mentioned, the release fails.

The query is whether in the absence of a release there was sufficient evidence of a settlement between Ricotta and Barnes. The record shows that Ricotta waived his fees and paid Barnes's medical bills. However, it does not show that the parties had a meeting of the minds on the question whether Barnes agreed to settle her lawsuit for malpractice against Ricotta and Ghazoul. In fact, it shows the opposite. Thus, a question of fact still remains on whether the parties agreed to a settlement and whether the consideration, waiver of fees and payment of

medical bills, constituted fair consideration under *Clavner*. Therefore, summary judgment was inappropriately granted.

Accordingly, Barnes's sole assigned error is well taken.

The judgment is reversed, and the cause is remanded for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

FRANK D. CELEBREZZE, JR., and COONEY, JJ., concur.