**Rex RAASCH, Plaintiff,**

v.

**NCR CORPORATION, Defendant.**

No. C–3–02–272.

United States District Court,
S.D. Ohio,
Western Division.

Jan. 22, 2003.

Randolph Harry Freking, Megan E. Clark, Freking & Betz, Cincinnati, OH, for Plaintiff.

C. Mark Kingseed, Randall M. Comer, Dinsmore & Shohl LLP, Dayton, OH, for Defendant.

DECISION AND ENTRY SUSTAINING DEFENDANT'S MOTION TO DISMISS AND COMPEL ARBITRATION (DOC. # 7); TERMINATION ENTRY

RICE, Chief Judge.

The question presented herein is whether an employer can enforce a mandatory arbitration policy imposed upon an at-will employee, where the employer had stated upon the initiation of the policy that the employee's continued employment with the company, along with the acceptance of any future pay raises, promotions, bonuses, and the like, would constitute his acceptance of that policy.

Plaintiff Rex Raasch was employed by Defendant NCR Corporation ("NCR") beginning in 1975. He was terminated in February, 2002. Believing that his termination was due to age-based animus on the part of NCR, Raasch, who was 55 years old at the time he was terminated, brought the underlying Complaint (Doc. # 1), pleading therein three causes of action: (1) age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"); (2) age discrimination in violation of Ohio Rev. Code § 4112.14; and (3) age discrimination in breach of Ohio's public policy against same.

Pointing to a binding arbitration agreement initiated by NCR in October, 1996, which listed disputes stemming from an employee's involuntary termination on its enumerated list of disputes subject to its provisions, NCR has filed a Motion to Dismiss and Compel Arbitration (Doc. # 7), arguing that this Court should enforce Raasch's purported agreement to forgo litigation in favor of submitting his discrimination dispute to arbitration. Raasch, in his Memorandum in Opposition (Doc. # 10), raises four objections to NCR's argument that the arbitration agreement is

binding upon him: (1) it is unenforceable because there is a lack of mutuality of obligation between the parties; (2) it is unenforceable because it contains a prohibitive fee-shifting clause; (3) it is unenforceable because NCR offered no consideration in return for his willingness to be bound by its terms; and (4) it is unenforceable because it operates as a contract of adhesion.

For the reasons which follow, the Court shall sustain Defendant's Motion.

## I. Standard for Ruling on NCR's Motion to Dismiss and Compel Arbitration

It must be noted first that NCR's Motion to Dismiss and Compel Arbitration is not a motion which comes within the ambit of Rule 12(b) of the Federal Rules of Civil Procedure, which allows a defendant to move to dismiss on, among other things, grounds that the court lacks subject matter jurisdiction or that the plaintiff's claim fails to state a claim upon which relief can be granted. Instead, the standard for ruling on NCR's Motion is defined by the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* ("FAA"), which provides that a party to an arbitration agreement that is aggrieved by another party's refusal to submit an arbitrable dispute to arbitration may petition any federal district court which would otherwise have jurisdiction over the underlying matter to compel arbitration. 9 U.S.C. § 4; *see also* 28 U.S.C. § 1331 (original federal question jurisdiction) & 28 U.S.C. § 1332 (original diversity jurisdiction). The FAA then contemplates a stay of the proceedings in federal court, as compared to dismissal of the action, "until such arbitration has been had in accordance with the terms of the agreement." *Id.* § 3. Be that as it may, where "the terms of the agreement" dictate that the arbitrator's decision is final and binding, the federal courts have held that dismissal is appropriate on that basis, once it has been determined that arbitration indeed must be compelled. *See, e.g., Arnold v. Arnold Corp.-Printed Communications for Business,* 920 F.2d 1269, 1276 (6th Cir.1990); *Orcutt v. Kettering Radiologists, Inc.,* 199 F.Supp.2d 746 (S.D.Ohio 2002).

## II. Factual Background

In evaluating motions or petition to compel arbitration, courts treat the facts as they would in ruling on a summary judgment motion, construing all facts and reasonable inferences that can be drawn therefrom in a light most favorable to the non-moving party. *See, e.g., Goodman v. ESPE America, Inc.,* 2001 WL 64749, at *1 (E.D.Pa. Jan. 19, 2001). Accordingly, the Court will look to the pleadings and other documentation attached thereto by the parties to lay the factual foundation, and construe those facts, and reasonable inferences that can be drawn therefrom, in a light most favorable to Raasch.

Raasch began his employment with NCR in 1975. (Compl.¶ 8.) While working at NCR, he was promoted at least four times, and received a number of plaudits for his job performance, including the "Best of the Best" team award in 1998. (*Id.* ¶¶ 10 & 11.) In June, 2001, he was presented with a reduction-in-force package (presumably a severance package), which he refused to sign. (*Id.* ¶ 13.) Under the terms of the reduction-in-force package, Raasch, had he agreed to it, would have had to waive any legal claim he had against NCR. (Raasch Aff., attached to Doc. # 10, ¶ 8.) On November 1, 2001, on the stated basis that his quality of work was deficient, NCR placed Raasch on a 60–day Performance Improvement Plan. (Compl.¶¶ 14–16.) On December 15, 2001, prior to the expiration of the 60–day improvement plan period, he was presented with a settlement agreement and general release of claims, and was informed that if

he did not sign it, he would be terminated without any severance benefits. (*Id.* ¶ 20.) He did not sign the agreement, and was terminated on February 1, 2002. (*Id.* ¶ 22.) At the same time, younger employees with less seniority were retained by NCR, while two other employees over the age of 50 were also terminated. (*Id.* ¶ 27.) After being without a job for about six months after his termination from NCR, Raasch moved with his family to Iowa, where he is currently employed. (Raasch Aff. ¶¶ 10–13.)

Several years earlier, in 1996, in his twenty-first year of employment at NCR, Raasch had received notice that NCR had initiated an employment-dispute policy, under which certain workplace disputes were subject to mandatory arbitration. (*Id.* ¶ 3.) NCR had not asked him for his express consent to the arbitration policy, but he did understand that the only way to avoid its effect was to resign. (*Id.* ¶¶ 4 & 5.)

The official name of NCR's arbitration policy, which became effective on October 1, 1996, is Addressing Concerns Together ("ACT"). (Doc. # 7 at Ex. 2, at 1.)[1] ACT does not immediately require arbitration of a dispute, but, rather, requires the resolution of such to unfold pursuant to a three-stage sequence. The first stage contemplates an informal resolution of the employee's grievance, either with his manager or someone else in his chain of command, or with the Human Resources Department or some other confidential advisor, depending on the nature of the dispute. (*Id.* at 3–4.) Stage 1 also contemplates that in instances of purported poor performance, an employee may be placed on a Personal Improvement Plan ("PIP"). (*Id.* at 4.) The employee may appeal the PIP decision within 48 hours to the highest manager in his chain of command, but barring this manager's disapproval with the decision, he must comply. (*Id.*)

Stage 2 contemplates a written appeal of any Stage 1 decision, including any demotion or termination that results from an employee's failure to meet the terms of her PIP. (*Id.* at 4–5.) The appeal is to be made to an NCR Leadership Team panel, which shall consist of the Senior Vice President of the Human Resources Department, the Senior Vice President of the Law Department, and the Senior Vice President of the division in which the employee works or had worked. (*Id.*)

Finally, at Stage 3, ACT contemplates that any dispute not resolved at Stage 1 or 2 shall be submitted to an arbitration panel of the American Arbitration Association (AAA), to be conducted in a neutral location and in accordance with the rules of the AAA. (*Id.* at 5, 6.) The appealing employee may retain legal counsel, and is entitled to depose two lay individuals and any expert witness expected to testify at the arbitration hearing. (*Id.* at 6, 7.) Filing and arbitration fees are to be shared equally unless the arbitrator reverses the Leadership Team panel's decision, in which case NCR is solely responsible. (*Id.* at 6–7.) Because Raasch's counsel values his claim at approximately $500,000 to $1 million, the parties can expect the costs and fees to amount to in excess of $8,000, according to the current fee schedule published by the AAA. (Clark Aff., attached to Doc. # 10, ¶ 4);[2] *see also* AAA's "National

---

1. Exhibit 2 to NCR's Motion is a copy of ACT as it has been incorporated into the company's Corporate Management Policy Manual. Prior to its formal adoption, employees, including Raasch, were mailed a brochure detailing ACT's salient features, a copy of which was attached as Exhibit 1, sub-exhibit A, to NCR's Motion. There is no material difference in the information contained in either document.

2. Megan E. Clark is counsel of record for Raasch.

Rules for the Resolution Employment Disputes," available at <http://www.adr.org/index2.1.jsp?JSPssid =15729> (rules effective as of Nov. 1, 2002).

ACT expressly states that it applies to "concerns involving," among other things, "a performance improvement plan," "involuntary termination," and "treatment that is perceived as unequal or discriminatory." (Doc. # 7 at Ex. 2, at 2.) With respect to Stage 3, the arbitration stage, it states:

> U.S. employees' agreement to all of the ACT policy provisions, including arbitration, will be expressed in one or more of the following ways, effective October 1, 1996:
>
> * By continuing employment with NCR
>
> * By accepting any transfers, promotions, merit increases, bonuses or any other benefits of employment[.]

(*Id.* at 5.) [3]

### III. *Analysis*

As noted, Raasch has raised four objections to NCR's Motion to Dismiss and Compel Arbitration, all premised on arguments that ACT is invalid insofar as he and his discrimination claims are concerned: (1) the purported agreement to be bound by ACT lacked mutuality of obligation; (2) it contains a prohibitive fee-shifting provision; (3) NCR gave no consideration; and (4) it is an adhesion contract. In this analysis, the Court will first set forth some background law on arbitration, and will then review ACT's scope and address Raasch's objections to its validity.

### A. *The State of the Law Surrounding Compelled Arbitration*

At common law, parties to binding arbitration agreements could revoke their submission to same prior to any award being granted. *See Juhasz v. Costanzo*, 144 Ohio App.3d 756, 761 N.E.2d 679, 684–85 (2001); *Kelm v. Kelm*, 73 Ohio App.3d 395, 597 N.E.2d 535, 539 (1992). While arbitration awards were enforceable, *see, e.g., Brennan v. Brennan*, 164 Ohio St. 29, 128 N.E.2d 89, 94 (1955) (noting that binding arbitration awards were held enforceable in Ohio, except where obtained by fraud or the like, at least as far back as 1835), American courts in general demonstrated hostility toward ordering specific performance of an agreement to arbitrate, seemingly adopting a jealous notion held by the common law courts of England that arbitration agreements were nothing less than a drain on their own authority to settle disputes. *See Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 219–220 n. 6, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). As the Ohio Supreme Court stated in an early case:

> It is a well settled principle of equity jurisprudence, that a Court of Equity will not force the specific performance of an agreement to refer any matter in controversy between adverse parties to arbitrators. Nor will they compel arbitrators to make an award. This doctrine is stated in 2 Story's Com. on Equity, 680. This principle was directly decided in the case of *Mitchell v. Harris*, 2 Vesey, Jr., 131, and in *Street v. Rigby*, 6 Vesey 817. The reason given for this rule is, that Courts of Chancery will not aid parties in ousting, by their agreements, the jurisdiction of the ordinary tribunals of the country, established for the trial of causes.

*Conner v. Drake*, 1 Ohio St. 166, 168–169 (Ohio 1853).

■ In response to this general mood of American courts, Congress enacted the

---

**3.** NCR, through the promulgation of ACT, did not attempt to curtail an employee's right to file a charge with any government agency charged with monitoring and investigating acts of workplace harassment and discrimination. (Doc. # 7 at Ex. 2, at 3.)

FAA "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). The pendulum has indeed swung. Section 2 of the FAA states in part that "a [written provision in any] contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." The Supreme Court has noted that the FAA promotes a " 'liberal federal policy favoring arbitration agreements,' " *id.* at 25, 111 S.Ct. 1647 (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)), and that the statute's reference in section 2 to transactions "involving commerce" demonstrates Congress' intent "to exercise [its] commerce power to the full." *Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995).

▪ In recent history, the Supreme Court has confirmed that the FAA can be invoked to enforce, pursuant to prior agreement, the arbitration of federal statutory claims, unless Congress has otherwise "evinced an intention to preclude a waiver

of judicial remedies" for such, *see Gilmer,* 500 U.S. at 26, 35, 111 S.Ct. 1647 (holding specifically that disputes arising under the ADEA may be submitted to arbitration), and to enforce any arbitration agreement which may be contained in an employment contract, other than an employment contract involving transportation workers. *See Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 119, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001); 9 U.S.C. § 1 (expressly excepting from the FAA's reach "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce"). Of course, it goes without saying that the arbitral forum must "allow for the effective vindication" of a plaintiff's statutory claim, *Floss v. Ryan's Family Steak Houses, Inc.,* 211 F.3d 306, 313 (6th Cir.2000), but "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 637, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).[4]

▪ The determinative factor of whether an arbitration provision can be enforced to settle a dispute is the existence of a contract between the parties demonstrating that they intended for such to be the case. *See Floss,* 211 F.3d at 314. That determination is made with reference to state-law contract principles. *Id.* (citing *Perry v. Thomas,* 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987)); *Orcutt,* 199 F.Supp.2d at 750–51.

---

4. The Supreme Court has apparently left the door open for challenges to the effectiveness of an arbitral forum, though it can be assumed that the plaintiff's burden of demonstrating that the arbitrator did not take appreciable cognizance of his or her statutory cause of action would be significant. *See Shearson/American Express Inc. v. McMahon,* 482 U.S. 220, 232, 107 S.Ct. 2332, 96 L.Ed.2d 185

(1987) ("Finally, we have indicated that there is no reason to assume at the outset that arbitrators will not follow the law; although judicial scrutiny of arbitration awards necessarily is limited, such review is sufficient to ensure that arbitrators comply with the requirements of the statute."); *Mitsubishi,* 473 U.S. at 637 n. 19, 105 S.Ct. 3346.

### B. The Scope of ACT and Raasch's Objections to Its Validity

■ Whether ACT contemplates disputes such as Raasch's is not an issue he raises, nor a question that gives the Court much pause, for it clearly does. As is plain from the facts stated above, it applies to every issue Raasch has touched upon in his Complaint: disputes stemming from having been placed in a PIP; disputes stemming from one's involuntary termination; and, more particularly, disputes stemming from what one perceives to be unequal and/or discriminatory treatment. Nor can it be disputed, in light of *Gilmer, supra,* that the FAA can be invoked to enforce the arbitration of an ADEA claim.[5] Rather, in this case, the question of whether Raasch should be compelled to submit his dispute to arbitration turns on whether ACT is valid as a matter of Ohio contract law. With this in mind, the Court will consider Raasch's objections to compelled arbitration in turn.

#### 1. Mutuality of Obligation

■ His first argument is that ACT is invalid because it does not evince a mutuality of obligation. (Doc. # 10 at 4–6.) On this point, his primary argument is that ACT "expressly excludes from coverage those claims NCR is most likely to have, i.e., 'disputes over confidentiality, non-compete agreements or intellectual property rights.'" (*Id.* at 4–5 (citing ACT).) The Court finds that Raasch has misinterpreted the principle underlying the mutuality of obligation doctrine.

■ Mutuality of obligation, or lack thereof, is not a problem in this case. The concept of mutuality of obligation requires that both parties to a contract be bound by the terms of the contract. *See, e.g., Floss,* 211 F.3d at 315–16. It goes hand in hand with the concepts of "consideration" and the "illusory promise" (which is basically an empty promise: promising to do one thing while, at the same time, expressly retaining the right to change one's mind). *See id.* at 316; 1 Samuel Williston, Contracts § 43, at 140 (3d ed.1957); 2 Arthur L. Corbin, Corbin on Contracts § 6.1 (Joseph M. Perillo, et al., eds., rev. ed.1995). Discussion of mutuality of obligations generally only arises in the context of a bilateral contract, where two parties bind themselves to an agreement by each promising to do one thing in exchange for the other's promise to do another thing. *See Helle v. Landmark, Inc.,* 15 Ohio App.3d 1, 472 N.E.2d 765, 776 (1984) ("Stripped to its essence, the concept of 'mutuality of obligation' expresses the idea that 'both parties to the contract must be bound or neither is bound.' However, this formulation applies only to an analysis of bilateral contracts, in which reciprocal promises are exchanged."); 2 Corbin on Contracts, *supra,* § 6.1, at 203–04. Thus, to say a contract lacks mutuality of obligation is to say only that one party has failed to *actually promise* to do the thing he said he would do, or, stated yet a third way, has failed to give consideration.[6]

The Sixth Circuit's decision in *Floss* provides an example of this. In that case, the

---

**5.** While the Court refers herein to the question of whether Raasch should be compelled "to arbitrate," it recognizes that arbitration represents merely the third stage of ACT's dispute resolution process. It need not concern itself with the stage at which Raasch's dispute will pick up should he be compelled to submit to ACT, and the Court's more frequent references to "compelled arbitration," as compared to "compelled submission to ACT," merely reflect the phrasing utilized by the parties and the reality that the ultimate question being decided is whether the final arbiter of Raasch's dispute will be an arbitration panel or this Court.

**6.** "It is consideration (or some other basis for enforcement) that is necessary, not mutuality of obligation." 2 Corbin on Contracts, *supra,* § 6.1, at 197. "If the requirement of consideration is met, there is no additional require-

arbitration agreement at issue was between an arbitration service provider and several employees of a restaurant who had agreed, with the arbitration service provider directly, to submit any employment disputes with their employer to it. 211 F.3d at 309–10. The Sixth Circuit held that the arbitration agreement could not be enforced because the arbitration service provider's promise to provide an arbitration service was "fatally indefinite," in that the provider "reserved the right to alter the applicable rules and procedures without any obligation to notify, much less receive consent from," the employees. *Id.* at 315–16.

> [The arbitration service provider's] illusory promise does not create a binding obligation. The purported arbitration agreement therefore lacks a mutuality of obligation. Without a mutuality of obligation, the agreement lacks consideration and, accordingly, does not constitute an enforceable arbitration agreement.

*Id.* at 316; *see also Cooper v. Cooper*, 1983 WL 4903 (Ohio Ct.App. April 29, 1983) ("In a bilateral contract, both promises must be legally binding [or] the contract is void for lack of consideration.").

 What mutuality of obligation *does not* mean is that the terms of the

contract must be equally balanced so that one side cannot benefit from the bargain more than the other. Raasch contends that because the arbitration provision excepts from its coverage certain disputes,[7] which it contends are typical of the kind which NCR itself would be most likely to initiate, it lacks mutuality, presumably because NCR retains the right to go to court for disputes it is more likely to initiate whereas its employees do not retain that right for disputes they are more likely to initiate. Even if the disputes excepted from ACT would generally be of the type NCR itself would be more likely to initiate, it miscomprehends the mutuality of obligation doctrine to state that this poses a problem.[8] Mutuality requires only that both Raasch and NCR be bound to the terms of any dispute that is required to be submitted to the arbitrator. For example, NCR cannot expect Raasch to be bound by the arbitrator's ruling on a question of age discrimination if it retains the right to reject the ruling in the event it is ultimately unfavorable to it, or if it retains the right to change the ground rules on how the arbitrator is permitted to reach its conclusion. Upon review, the Court finds no indication in ACT's provisions that NCR has withheld its own obligation to abide by any decision rendered by an arbitrator pursuant to a Stage 3 dispute.[9]

ment of . . . 'mutuality of obligation.' " Restatement (Second) of Contracts § 79(c).

7. Several types of disputes are excepted from coverage of ACT (at any stage), including "disputes over confidentiality/non-compete agreements or intellectual property rights." (Doc. # 7 at Ex. 2, at 3.)

8. Raasch may have in mind a requirement that there be equal consideration, but this is unnecessary. As long as consideration exists on both sides, an issue the Court addresses below, the adequacy of such is not an issue for a court to consider. *See Rogers v. Runfola & Associates, Inc.*, 57 Ohio St.3d 5, 565 N.E.2d 540, 542 (1991); *see also* 2 Corbin on

Contracts, *supra*, § 6.1, at 207. Furthermore, to the extent Raasch may be complaining that NCR retains the upper hand from a bargaining position, that is no reason to invalidate ACT, even if true, absent fraud or some other ground existing in equity for its revocation. *See Gilmer*, 500 U.S. at 33, 111 S.Ct. 1647.

9. Nothing in the FAA requires that all disputes go through an established arbitration process. Moreover, it is worth repeating that the rules and procedures established for ACT's arbitration proceedings are those of the AAA, not NCR, and that NCR agreed that it, as well as its employees, would not be permitted to "seek resolution from a court or a jury

That is all that is required insofar as mutuality of obligation is concerned; nothing in that doctrine requires that just because both parties agree to arbitrate discrimination disputes and the like they also must agree to arbitrate every other type of dispute.

Raasch cites several cases in support of his argument that are either inapposite or unpersuasive. To begin with, *Floss*, discussed above, is inapposite. As noted, that case involved an agreement which gave one party an unfettered right to change the details of the agreement, rendering the agreement no agreement at all. *Cf. Dumais v. American Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir.2002) (following *Floss* and holding that where the employer retained the unfettered right to alter the arbitration agreement's existence or its scope, it is illusory and unenforceable). ACT does not contain any such defect, at least not one to which Raasch has directed the Court's attention. Nor is Judge Spiegel's decision in *Hagedorn v. Veritas Software Corp.*, 250 F.Supp.2d 857 (S.D.Ohio 2002), incompatible with the Court's decision in this case. The defect in the arbitration clause at issue in *Hagedorn* was that it required employees to take all disputes to arbitration while allowing the employer alone to utilize the court system to protect its interests in the very same disputes. Such is not the case with ACT: NCR, as with Raasch, must proceed through the non-judicial stages with respect to any dispute subject to ACT resolution.

Finally, two California cases relied upon by Raasch are unpersuasive on this issue because they were decided on different grounds and under a different state's law.

In *Mercuro v. Superior Court*, 116 Cal. Rptr.2d 671, 96 Cal.App.4th 167 (Cal.Ct. App.2002), and *Armendariz v. Foundation Health Psychcare Services, Inc.*, 6 P.3d 669, 24 Cal.4th 83, 99 Cal.Rptr.2d 745 (Cal. 2000), both referenced by Judge Spiegel in *Hagedorn*, arbitration provisions were struck down on principles of unconscionability (under California law), upon findings that the employers had retained the right to take many of their disputes to court while requiring their employees to submit their disputes to arbitration.[10] The Court will address the concept of unconscionability under Ohio law in greater detail below, when it addresses Raasch's arguments concerning the fee-splitting provision and his contention that ACT is a contract of adhesion. However, to the extent *Mercuro* and *Armendariz* might be read for stating that the arbitration provisions at issue therein failed for lack of mutuality, their holdings are unpersuasive. As noted, whatever other doctrines may be implicated, lopsided agreements do not implicate the mutuality of obligation doctrine. Once again, mutuality of obligation requires only that both NCR and Raasch bound themselves to the outcome of any dispute they agreed to arbitrate, not that they agreed to arbitrate every dispute, or that the disputes they did agree to arbitrate (or not arbitrate) were of equal concern to each.

### 2. *Fee–Splitting*

█ Raasch's second argument is that ACT contains a "fee-shifting" provision which makes it cost-prohibitive to him to avail himself of arbitration in any event. As noted above, the provision to which he refers is more accurately regarded as a fee-splitting provision. His argument, of

to decide employment disputes covered by ACT." (Doc. # 7 at Ex. 2, at 5.)

**10.** Another significant difference between the arbitration provision at issue in *Mercuro* and

the one at bar, dispositive in its own right, is that it did not guarantee a neutral arbitrator. 116 Cal.Rptr.2d at 676, 96 Cal.App.4th at 175. ACT contains no such defect.

course, is that merely by imposing upon him a requirement to pay a share of the arbitration fee up front, which, according to representation from his counsel, will likely exceed $4,000 in this case, ACT "shifts" on to him an up-front cost which he would not otherwise bear in a court of law. NCR points out in response that the evidence demonstrates that he can afford such a cost, and that, in any event, if he succeeds in having its decision to terminate him reversed, it will have to bear the entire cost.

The starting point on this issue is the Supreme Court's recognition that "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Mitsubishi*, 473 U.S. at 637, 105 S.Ct. 3346; *Gilmer*, 500 U.S. at 28, 111 S.Ct. 1647; *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 90, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000). In *Green Tree*, which involved a commercial arbitration agreement, the agreement did not expressly state which party or parties was or were responsible for arbitration costs and fees, or how much said costs and fees would be. 531 U.S. at 89–92, 121 S.Ct. 513. Addressing the prohibitive effect of such costs and fees on one's ability to vindicate himself of a statutory right, the Supreme Court stated: "It may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum." *Id.* at 90, 121 S.Ct. 513. However, "where, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Id.* at 92, 121 S.Ct. 513.

The Sixth Circuit has not addressed this issue directly, though it has stated in dic-

tum, without regard to specific dollar figures, that a fee structure which requires an employee to pay one-half of the arbitrator's fee "could potentially prevent an employee from prosecuting a federal statutory claim against an employer." *Floss*, 211 F.3d at 314. Other federal courts of appeals are split on this issue. Some view the up-front obligation of an aggrieved employee to pay arbitration fees and costs, which would not be borne *up front* were the claim to proceed in a court of law, as prohibitive to a plaintiff's right to vindicate her statutory rights, and on this basis treat the arbitration agreements as *per se* invalid. *See, e.g., Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054, 1062 (11th Cir.1998) (holding that where an arbitration agreement does not specify which party is responsible for the fees, a potential cost to the plaintiff of about $2,000 is "a legitimate basis for a conclusion that the clause does not comport with statutory [Title VII] policy"); *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1484–85 (D.C.Cir.1997) (holding that arbitration agreements imposed upon employees by an employer are only enforceable if the employer agrees to pay all of the arbitrator's fees); *see also Geiger v. Ryan's Family Steak Houses, Inc.*, 134 F.Supp.2d 985, 996 (S.D.Ind.2001); *Armendariz*, 99 Cal. Rptr.2d 745, 6 P.3d at 685–89. In light of the Supreme Court's decision in *Green Tree*, which placed the onus on the plaintiff to demonstrate that a fee structure is cost prohibitive, these holdings are questionable, particularly *Paladino*, the logic of which seems to have been squarely rejected by *Green Tree*.

The majority of the circuit courts which have addressed this issue have developed a different standard, holding that a fee-splitting provision does not *per se* invalidate an arbitration agreement, and that the inquiry into whether a particular

plaintiff can be compelled to arbitrate pursuant to such a fee structure turns on a case-by-case analysis of the plaintiff's ability to pay. *See, e.g., Blair v. Scott Specialty Gases,* 283 F.3d 595, 610 (3rd Cir.2002) (rejecting *per se* rule that fee-splitting provision renders an arbitration agreement invalid, but remanding to district court for limited discovery and inquiry into whether such an imposition was prohibitive to the plaintiff in that particular case); *Bradford v. Rockwell Semiconductor Sys., Inc.,* 238 F.3d 549, 556 (4th Cir.2001) (stating that "the appropriate inquiry" is one which "focuses ... upon the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims," and affirming district court's finding that plaintiff had not demonstrated his share of the fee (almost $4,500) was prohibitive to the vindication of his rights); *Williams v. Cigna Fin. Advisors Inc.,* 197 F.3d 752, 764 (5th Cir.1999) (holding that a fee-splitting provision did not invalidate the arbitration agreement because the plaintiff had not shown that his having to pay over $3,000 in arbitration fees was prohibitive to his ability to vindicate his statutory claims), *cert. denied,* 529 U.S. 1099, 120 S.Ct. 1833, 146 L.Ed.2d 777 (2000); *Shankle v. B–G Maintenance Mgmt. of Colo.,* 163 F.3d 1230, 1234–35 (10th Cir.1999) (holding that an arbitration agreement was invalid because the plaintiff's total estimated arbitration costs of between $1,875–$5,000 were prohibitively high); *cf. Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 170 F.3d 1, 16 (1st Cir.1999) (observing that the total cost of arbitrating a claim is frequently less than the cost to litigate same, and that the "undesirable" failure of an arbitrator to award attorneys' fees in a particular case, where such is required by federal statute, "does not mean the arbitral system is structurally inadequate"); *Koveleskie v. SBC Capital Markets, Inc.,* 167 F.3d 361, 366 (7th Cir.) (same), *cert. denied,* 528 U.S. 811, 120 S.Ct. 44, 145 L.Ed.2d 40 (1999).

This Court has previously held that "the *per se* invalidation of an arbitration agreement, due to the presence of a fee-splitting provision, contradicts the Supreme Court's declaration that a party wishing to invalidate an arbitration provision bears the burden of proving the likelihood of incurring prohibitively expensive costs." *Manuel v. Honda R & D Americas, Inc.,* 175 F.Supp.2d 987, 994 (S.D.Ohio 2001) (referring to the Supreme Court's holding in *Green Tree* ). The facts of *Manuel* were somewhat different than those herein, in that in that case the arbitration agreement at issue arose part and parcel to a settlement agreement stemming from earlier litigation, in which the parties had agreed to arbitrate any future dispute related to their litigation and settlement. The question raised by the defendant in *Manuel* was whether the plaintiff, Manuel, was required to arbitrate his particular claim. Recognizing the posture of the parties, the Court noted that it had no occasion to consider the validity of a fee-splitting provision arising out of an employer-employee relationship, where "the employer typically has substantially greater bargaining power than the employee." *Id.* at 995 (citing *Cole, supra* ). The case at bar, obviously, is the very type of case which the Court in *Manuel* was distinguishing. Be that as it may, the Court's suggestion in *Manuel* that the two types of cases are distinct, and its citation to *Cole,* should in no way be read for the proposition that *Cole,* on the whole, was, in this Court's opinion, properly decided; it was merely emphasizing that its plaintiff, Manuel, had an even weaker basis to argue that a *per se* rule of invalidity should apply than a plaintiff in the position of someone such as Raasch. The primary holding was, after all (as not-

ed above), that a *per se* rule runs counter to the Supreme Court's holding in *Green Tree.*

The Court finds no reason to retreat now from what is obviously the better rule, which is to make a factual determination on whether Raasch can afford the arbitration fees ACT imposes upon him. This approach spares the validity of ACT as a whole while preserving an individual claimant's ability to vindicate his statutory rights granted to him by Congress; it guarantees the claimant a forum to air his statutory grievances: in the arbitral forum whenever possible, but in a court of law if the cost of the arbitral forum is prohibitive. Moreover, it is consistent with the general maxim that arbitration agreements are to be favored and presumed valid, *unless* a claimant can demonstrate how such would not have been at common law or in equity. *See Green Tree,* 531 U.S. at 91–92, 121 S.Ct. 513; 9 U.S.C. § 2. The Court must be careful, though, for it would no doubt be shortsighted to subject the validity of an arbitration agreement to whimsical *ad hoc* factual determinations, enforceable as to some claimants but not to others, without a clear and accepted standard. Such a course would be tantamount to casting aside Congress' intent, in passing the FAA, "to reverse the longstanding judicial hostility to arbitration agreements," and would be unfair to the party seeking the agreement's enforcement.

■ The doctrine of unconscionability provides the most convenient rubric for evaluating the validity of a fee-splitting provision on a case-by-case basis (it being a doctrine that existed in equity justifying the revocation of a contract). *See, e.g., Manuel,* 175 F.Supp.2d at 995 (finding that the fee-splitting provision at issue was not

"substantively unconscionable"). In Ohio, a contract may be deemed unconscionable if it can be shown that (1) there was an absence of meaningful choice or understanding of the terms on the part of one party ("procedural unconscionability") or (2) the contract incorporated terms that were so unfair to one party that their enforcement would be unreasonable ("substantive unconscionability"). *See Lake Ridge Acad. v. Carney,* 66 Ohio St.3d 376, 613 N.E.2d 183, 189 (1993); *Jeffrey Mining Prods. v. Left Fork Mining Co.,* 143 Ohio App.3d 708, 758 N.E.2d 1173, 1180–81 (2001); *Cross v. Carnes,* 132 Ohio App.3d 157, 724 N.E.2d 828, 837 (1998); *Dorsey v. Contemporary Obstetrics & Gynecology, Inc.,* 113 Ohio App.3d 75, 680 N.E.2d 240, 243 (1996). Because the fee-splitting provision is a term of ACT, its incorporation into the policy implicates the concept of substantive unconscionability. (The Court will return to the issue of procedural unconscionability below, when it addresses Raasch's argument that ACT is a contract of adhesion.)

Turning to the pertinent facts, NCR represents that at the time Raasch was discharged, he was earning $99,400 per year, that he currently receives a monthly pension payment of $2,075.32, or about $24,903.84 per year, and that upon his leaving NCR, he withdrew from his company § 401k account $367,356.05. (Guerrier Aff., Doc. # 11 at Ex. A, ¶¶ 3, 7 & 8.) [11] Raasch, as noted, states that he was unemployed for six months after being terminated by NCR. (Raasch Aff. ¶ 11.) He and his wife spent $30,000 in moving to their current home in Iowa. (*Id.* ¶ 12.) His earnings at his new job in Iowa as of the date of his affidavit, October 24, 2002, were between $15,000–$20,000. Assuming,

---

11. Nadine Guerrier, who supplied this information, is a Human Resources Consultant at NCR. (Guerrier Aff. ¶ 1.)

based on his February termination date, that he began work around August 1, 2002, it can be interpolated that Raasch earns between $5,000–$6,666 per month from his new job. His wife does not earn an income, and he helps support his sister, whose husband is unable to work full-time due to a disability. (*Id.* ¶ 6.) There is no indication that he has children to support.

The Court does not find that this fee-splitting provision is so one-sided in NCR's favor that it renders ACT unconscionable by erecting a prohibitive bar to Raasch's ability to vindicate his rights under the ADEA. Raasch argues in his Memorandum in Opposition that the fee-splitting provision is prohibitively expensive because "the ACT program was instituted 21 years after [he] began work at NCR and without his consent." (Doc. # 10 at 8.) The Court will address the matter of "consent" below, but the fact that ACT was instituted twenty-one years after he began employment with NCR is irrelevant to whether the fee-splitting provision is cost-prohibitive.

He then asks the Court to consider the factors discussed in *Manuel.* (*Id.*) Those factors are (1) the potential *total* cost of pursuing the matter in arbitration, (2) the potential *total* cost of pursuing the matter in litigation, and (3) the plaintiff's financial ability to bear the cost of arbitration. 175 F.Supp.2d at 992–93. Raasch points out that his up-front costs will be significantly greater if he has to arbitrate his claim than they would be if he were permitted to remain in this court. (Doc. # 10 at 9.) This is no doubt true, but as he himself notes in referencing *Manuel,* the question to be asked is not whether his up-front

costs are greater; rather, the correct questions are two: (1) how will his potential total cost of arbitration compare to his potential total cost of litigation, assuming a worst case scenario (i.e., that he loses in either forum)?; and (2) is he able to afford the up-front costs of arbitration so that he will at least have an opportunity to vindicate his rights in that forum? The Court is unable to make a finding on the first question, because he has not offered estimates of his total potential costs in either forum. With regard to the second question, while he makes a case that he was unemployed for half a year and then incurred substantial moving costs in relocating to Iowa, he does not state in his affidavit that he cannot afford arbitration, or even suggest that a severe hardship will result from his having to pursue his claim in that forum.[12] (While he states that he helps support his sister, he does not quantify what that "support" is.) Clearly, he will be put to a different cost arrangement than he would be were he permitted to pursue his claim in court, but the structural differences between arbitration and traditional litigation do not render the former invalid in this case any more than they would in any other case, absent a *factual* showing of the *actual* prohibitive structure of ACT's arbitration agreement.

As a final matter on this point, the Court finds that Raasch's "belief" that NCR terminated him under different circumstances than it had others in his position in the past (*id.* at 9 n. 2) to be irrelevant to the question of unconscionability: it puts the cart before the horse by asking the Court to consider a merits issue in determining whether that very issue must be presented to the arbitrator.

12. The Court is aware that the necessity of splitting arbitration fees on the front side of a dispute may have a negating effect on the principle underlying contingent-fee arrangements. Be that as it may, the Court has not been made aware of Raasch's fee arrangement, and regardless of what that arrangement is, it does not make it any less the burden of Raasch to show that the fee-splitting provision makes it cost-prohibitive to raise his claim.

### 3. *Consideration*

■ Raasch's third argument against compelled arbitration is that ACT is unenforceable because NCR did not offer consideration of its own. Again, the Court disagrees. The primary issue argued by the parties on this topic is whether an employer's offer of *continued* employment is consideration for an *existing* employee's return consideration of agreeing to the terms of the arbitration agreement. What stands out to the Court foremost is that Raasch's argument appears erroneously premised.

■ In simplest terms, consideration is the promise of one party to do something it is not obligated to do in exchange for another's promise to do something else. *See Floss,* 211 F.3d at 315. It is impossible, however, to attach a universal definition to "consideration" to fit the precise details of every factual situation. At-will employment is one such situation where the concept of consideration must be applied with care. By its terms, at-will employment is unilateral, meaning that the promises do not flow both ways at the outset. When an employer hires an employee to perform certain services without regard to a definite period of time, it may promise certain remuneration in exchange for those services, but, in the run of cases, the putative employee is not bound to perform those services. By the same token, the employer is not bound to its offer of remuneration unless and until the employee actually performs pursuant to the stated terms. *See generally* 2 Corbin on Contracts, *supra,* § 6.2. Even if the employee performs at first, she remains free not to return the next day, and the employer remains free to tell the employee that she is not welcome back, and if either so states such a position, neither is liable to the other. Furthermore, although an employer is bound to pay his at-will employees for services rendered, *see id.,* at 213, those employees can expect no more than they were promised. By the same token, nothing prevents an employer from informing his employees that in the future, their wages will be halved. They have no obligation to accept the new terms, but if they do, by performing the agreed-upon services, they can expect only what they were promised. Each day constitutes, more or less, a new agreement, and an employer's offer of something less than what it offered the day before does not make the subsequent day's offer invalid: it is merely up to the employee to accept or reject the new terms.

■ In similar fashion, other terms of employment stated by the employer and made known to the employee are also binding upon the employee. Again, if they disagree with any such term, they are not obligated to accept it, but they have no basis on which to object should they choose to accept it by performing the agreed-upon services and accepting the agreed-upon remuneration. Once they proceed in their performance, they are accepting the terms as set forth by the employer, and as long as the employee remains in its employ the employer may enforce its terms as a condition of the employee's having accepted its offer of employment. In other words, by performing the requested services, at-will employees are bound by the whole package of the employer's offer, which includes not only the agreed-upon remuneration, but also any other term or condition of employment made known by the employer. Before the concept of consideration can be invoked and applied to this type of arrangement, however, one must understand the proper temporal context of the party's actions, and how one party's actions work to bind the other, and vice versa, an issue the Court will address shortly.

To an extent, Judge Dlott, of the Southern District Court of Ohio, considered the

question of whether continued employment can constitute valid consideration in *Herring v. Globe Furniture Co.*, Case No. C–1–00–975 (S.D.Ohio Nov. 14, 2001) (Order Denying Defendant's Motion to Dismiss or to Stay Action and Compel Arbitration) (copy attached to Doc. #10), and suggested that it is not. In *Herring*, the employer, Globe, distributed a revised employee policy manual in 1996 containing a mandatory, binding arbitration provision, which covered disputes related to one's termination, including those stemming from alleged discrimination. The plaintiff, Herring, signed an agreement expressing her agreement to be bound by the provision. Importantly, Globe also inserted a sentence in the agreement form which stated that it retained the right to change the terms of the employee manual at any time, without prior notice to employees. Judge Dlott concluded that this express reservation of the right to amend the terms of the manual at any time made its promise to be bound by the terms of the arbitration provision illusory, and the provision therefore unenforceable. Furthermore, in a footnote, Judge Dlott stated that the offer of continued employment cannot be considered consideration because the employer is no more obligated to retain an at-will employee after the adoption of a new term of employment than it was before the adoption of same.

This Court finds the facts of *Herring* inapposite. The holding in *Herring* rests on a lack of mutuality of obligation between the two parties, a defect which does not exist in this case for the reasons stated above,[13] and the comment on whether continued employment can constitute consideration was dictum. In any event, it appears that a majority of the Ohio Courts of Appeals have taken a different approach to the question of continued employment as consideration, and it is Ohio law that must be construed in this case. *Compare Canter v. Tucker*, 110 Ohio App.3d 421, 674 N.E.2d 727 (1996) (10th Dist.) (holding that continued employment constitutes sufficient consideration to support a covenant not to compete); *Copeco, Inc. v. Caley*, 91 Ohio App.3d 474, 632 N.E.2d 1299 (1992) (5th Dist.) (same); *Swagelok Co. v. Young*, 2002 WL 1454058 (Ohio App. July 3, 2002) (8th Dist.) (same); *Long Bus. Sys. v. Bable*, 2002 WL 606281 (Ohio App. April 19, 2002) (11th Dist.) (same); *Willis Refrigeration, Air Conditioning & Heating, Inc. v. Maynard*, 2000 WL 36102 (Ohio App. Jan. 18, 2000) (12th Dist.) (same); *Sash & Storm, Inc. v. Thompson*, 1997 WL 784350 (Ohio Ct.App. Dec.22, 1997) (3rd Dist.) (same); *Stites v. Napoleon Spring Works, Inc.*, 1996 WL 660655 (Ohio App. Nov. 15, 1996) (6th Dist.) (same); and *Trugreen LP v. Richwine*, 1994 WL 312937 (Ohio Ct. App. June 29, 1994) (2nd Dist.) (same), *with Lake Land Employment Group of Akron v. Columber*, 2002 WL 31313531 (Ohio App. Oct. 16, 2002) (9th Dist.) (holding that promise of continued employment is not enough by itself to enforce a covenant not compete imposed upon an existing employee); *cf. Thompson v. Clough*, 2001 WL 328561 (Ohio Ct.App. March 28, 2001) (4th Dist.) (holding that continued employment was not consideration for an employee's covenant not to compete where the employer did not threaten to fire employee if he did not sign).[14]

The Court will now address the importance of understanding the temporal as-

---

**13.** Raasch has not directed the Court's attention to any provision in ACT specifically, or NCR's Corporate Management Policy Manual more generally, which allows NCR to change the terms of ACT, particularly the Stage 3 arbitration provision, without notice and without regard to pre-existing claims.

**14.** In all of these cases, the dispute was over whether the employer's offer of continued employment was consideration for the existing

pects of the concept of consideration. Judge Dlott's perspective on whether continued employment is consideration makes sense when one considers that an employer has no obligation to continue employing its at-will employees. From that perspective, a promise to continue to employ an individual seems illusory. However, when one thinks of "continued employment" not as a promise of guaranteed employment for a definite period of time, which would be illusory, as noted (or would otherwise transform the employee into a contract employee), but rather as a promise not to terminate the employee as long as he agrees to certain terms, it is easier to see how such is, in fact, a form of consideration. What NCR implicitly stated to its employees, including Raasch, is that it would not fire them (i.e., it would continue to employ them) as long as they assented to the terms of ACT. That Raasch understood this is made clear by his affidavit: "I understood that the only way to avoid the program was to resign from the company." (Raasch Aff. ¶ 5.)

Just as an employer has every right (barring other equitable considerations) to inform its at-will employees that it is halving their pay in the future, it may inform its employees that it is altering the means by which they may air legal grievances. While the deprivation of one's right to seek legal redress in a court of law might at first glance appear contrary to some stronger public policy, the Supreme Court has stated that an arbitral forum stands on equal footing with a court of law, insofar as the ability to resolve legal disputes is concerned. *See Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490

U.S. 477, 481, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). Though some may disagree with this assessment, it is the law which this Court is bound to recognize. Thus, where an employer informs its employees that from this point forward, certain disputes must be directed to arbitration, while the employees are not obligated to continue in their employment, as long as they do, they are obligated to comply with the terms set by the employer, and the fact that they no longer have a remedy in a court of law is of little consequence. The consideration is given by the employer when the employee accepts the offer of continued employment.

In any event, continued employment is not all that NCR offered as consideration. More obviously, what it offered as consideration was its agreement to be bound to arbitrate all matters arising out of the very employment-related disputes which it expected its employees to arbitrate. To be sure, this consideration may appear inadequate to an employee who formerly had the option of airing his disputes with his employer in a court of law, but three observations demonstrate why this appearance of unfairness is inconsequential. *First,* as the Court just noted, the Supreme Court has repeatedly stated over the years, since the enactment of the FAA, that the apparent shortcoming of arbitration as a forum in which one may satisfactorily air one's legal grievances is based on outmoded, preconceived notions of the adequacy of arbitration. "We have likewise rejected generalized attacks on arbitration that rest on 'suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants.'" *Green Tree,* 531 U.S. at

employee's promise to be bound by a post-termination non-compete agreement. Nevertheless, although the nature of the underlying agreement was different than that at issue in this case, contractual concepts such as con-

sideration are generally applicable, and the Court sees no reason why a form of consideration recognized with respect to one type of contract would not be equally acceptable with respect to another type.

90, 121 S.Ct. 513 (quoting *Rodriguez de Quijas*, 490 U.S. at 481, 109 S.Ct. 1917). *See also Gilmer*, 500 U.S. at 30, 111 S.Ct. 1647 ("We decline to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious and impartial arbitrators") (quoting *Mitsubishi*, 473 U.S. at 634, 105 S.Ct. 3346).

 *Second*, inadequate consideration is still sufficient for purposes of forming a valid contract. *See Barnes v. Ricotta*, 142 Ohio App.3d 560, 756 N.E.2d 218, 222 (2001) ("So long as the consideration is valuable it does not become insufficient merely because it may not be adequate."). NCR's promise to adhere to the terms of ACT was sufficient consideration. To return to the Court's example of the employer who informs his at-will employees that in the future they will only be paid half of what they were paid for the same work in the past, if its employees perform and it pays them the reduced wage, then that payment constitutes consideration. No doubt this is inadequate consideration compared to what it had previously offered, but it is consideration nevertheless, and if an employee accepts it, his employer has the right to enforce any condition of employment which it set forth and made known to him prior to his performance. (Even with this being true, there remains, in any event, the Supreme Court's opinion that nothing about arbitration makes it inherently inadequate when compared to traditional litigation. *See Gilmer*, 500 U.S. at 31, 111 S.Ct. 1647. Although, on one hand, the rules of discovery and process are typically more limited, there is, on the other hand, the empirical fact that arbitration usually results in a much more simplified and expedient resolution of the issue. *See id.*)

 *Third*, the terms of at-will employment are by the very nature of such employment controlled more by market forces than by contractual rights, which is to say, employers of at-will employees have every right to change the rules of engagement, subject only to existing laws and market forces. This follows from the observation that if an employer of such an employee were to phrase the offer not as "by continuing your employment you agree to arbitrate all grievances," but, rather, as, "if you do not agree to arbitrate all grievances you will be discharged," the employee would have no ground on which to object to the imposition of such. *See, e.g., Trugreen*, 1994 WL 312937, at *3 (noting that an employer's only alternative to imposing any new condition of employment which it deems necessary upon its existing at-will employees would be to fire all of them and tell them that it will not hire them back unless it agrees to the necessary condition); *see also Clough*, 2001 WL 328561, at *3 (holding that continued employment was not consideration for an employee's covenant not to compete where the employer did not threaten to fire employee if he did not sign). Thus, given that an employer can impose any (legal) condition upon a new employee as a condition of hire, and given that "at will" means that an employer can discharge an employee for any (legal) reason whatsoever, *see Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150, 155 (1985), to hold that an employer can impose an arbitration provision upon a new hire but not upon an existing employee would be to create, as stated by the Second District Court of Appeals in *Trugreen*, an "artificial" distinction, for it would require the employer to take the inefficient step of terminating all of its employees in order to enforce, upon new or re-hired employees, a condition of employment which it considers necessary. 1994 WL 312937, at *3.

While the concept of at-will employment has been altered in specific areas by the

enactment of workplace discrimination laws, it remains a viable rule where not otherwise excepted by such laws. The Court knows of no law, state or federal, which prohibits an employer in Ohio from discharging an employee because said employee refuses to agree to arbitrate certain disputes. While the arbitrator must respect federal workplace discrimination laws in rendering its decision, nothing in those laws bars it from resolving all issues arising thereunder. As noted, Raasch has demonstrated that he was fully aware that his refusal to abide by the terms of ACT was grounds for his dismissal. (Raasch Aff. ¶ 5.) For this reason, there is no bar to finding that NCR offered valid consideration when it permitted Raasch to remain in its employ (or, stated differently, did not discharge him) and agreed to be bound to the terms of ACT just as it expected him to be.

 Notwithstanding the Court's belief that this process can be stated in terms of consideration, the better way of approaching the issue is by asking whether Raasch ever accepted the proposed arbitration agreement, or, to use Raasch's own terminology, whether he ever gave his "consent." In fact, this is how NCR expressed the issue in its notice to its employees that it was initiating ACT:

> You will not be asked to sign anything in conjunction with this new policy. Instead, your *agreement* to all of the ACT policy provisions, including arbitration, will be expressed in one or more of the following ways, beginning October 1, 1996:
>
> * By continuing your employment with NCR
>
> * By accepting any transfers, promotions, merit increases, bonuses or other benefits of employment.

(Emphasis added.)

 Generally speaking, an offer to contract cannot be accepted by silence un-

less one's silent acts demonstrate acceptance based on a past practice or course of conduct. For example, a newspaper delivery boy who, beginning one day, throws a paper onto the porch of a homeowner who has never before ordered the paper, along with a note stating that he will deliver a paper everyday and call upon the homeowner at the end of the month to collect a certain amount of money in exchange, cannot collect at the end of the month if the homeowner is out of town or has otherwise refused to acknowledge the proposed bargain by letting the papers collect on her front porch. That is, the delivery boy cannot rely on the homeowner's silence as an expression of acceptance (of the offer to provide a daily newspaper in exchange for money). *See generally,* 1 Corbin on Contracts, *supra,* § 3.18. On the other hand, if the homeowner collects and reads the paper everyday, it is likely that a contract will be implied despite the lack of an expressed acceptance: the homeowner's acts constitute acceptance of the offer. *See generally, id.,* §§ 1.11 & 3.8.

NCR contends that Raasch accepted the arbitration agreement (i.e., agreed to be bound by the arbitration provision) by continuing in his employment with NCR and by accepting future promotions, pay increases, bonuses, and other benefits. Both of these "forms of acceptance" were set forth in the informational brochure distributed to him and other NCR employees. The potential defect in NCR's argument is that there is every reason to think that Raasch would have performed in identical fashion even had he not been made aware of ACT. It might therefore be argued, as Raasch does, that his continued employment and acceptance of various raises and benefits cannot be construed as an acceptance of the terms of ACT, or a "consent," as he refers to it, because his actions do not provide appreciable indicia of his assent. This is akin to the problem noted by

the Fourth District Court of Appeals in *Clough,* where the court held, phrasing the issue in terms of consideration, that continued employment cannot constitute consideration where the employee was not otherwise threatened with discharge. 2001 WL 328561, at *3. Re-characterized in terms of offer and acceptance, the question is whether Raasch's act of continuing to work for NCR after it stated that doing so would constitute acceptance of the new term of employment demonstrates his assent to, or acceptance of, same.

The answer is "yes," because, as noted, Raasch was fully aware that *"the only* way to avoid the program was to resign from the company." (Raasch Aff. ¶ 5 (emphasis added).) By not acting in the manner which he personally recognized was the only way to avoid accepting ACT's terms, he knowingly accepted it.

At the end of the day, neither the consideration nor the acceptance doctrine requires a finding that ACT is invalid and revocable.

### 4. *Contract of Adhesion*

Raasch's final argument against compelled arbitration is that ACT is nothing less than a contract of adhesion. Contracts of adhesion are, generally stated, contracts drafted by one party without regard to the concerns of the other party; they are created without meaningful negotiations. *See generally* 1 Corbin on Contracts, *supra,* § 1.4; *e.g., Ohio Univ. Bd. of Trs. v. Smith,* 132 Ohio App.3d 211, 724 N.E.2d 1155, 1160–61 (1999). Typically given as examples of such contracts are consumer loan agreements which state, in standardized, pre-printed forms, take-it-or-leave-it terms, drafted without any dickering. *See Lear v. Rusk Indus., Inc.,* 2002 WL 31716383 (Ohio Ct.App. Dec.4, 2002). Where a contract is voided for being one of adhesion, it is generally on the basis that it is unconscionable from a procedural stand-

point. *See, e.g., Smith,* 724 N.E.2d at 1161.

This argument is also not persuasive. As with Raasch's other arguments, while the invocation of the contract of adhesion doctrine is not unreasonable, it lacks force in this context. If an employer were not allowed to dictate terms of a new policy and impose same upon its at-will employees as a condition of continued employment, then "at will" would no longer mean "at will." That might be the better public policy, and there is certainly a rich body of commentary setting forth the arguments in favor of requiring employers to state good faith, business-necessitated reasons for terminating what would historically be at-will employees. It is not, however, the current law, and it is not for this federal court to inject its own policy views into the at-will employment doctrine of Ohio. In any event, two observations bear mention: *First,* NCR may well believe, as it seems to, that the mandatory arbitration of certain disputes makes sound business sense, and it is simply not a court's place to question the business decisions of a private company. *Second,* as noted above, the Supreme Court has made it clear that as long as an arbitral forum is provided for vindicating statutory rights, it is no moment that the right to vindicate same in a court has been denied. Quite simply, the act of replacing an employee's access to the courts for airing employment-related disputes with access to an arbitral forum, provided it appears fair and impartial, cannot be viewed as a penalty or the like.

As long as an employer gives an at-will employee proper notice of a new policy, and can show that the employee understood the new policy, the Court is hard pressed to conceive of how the policy, as long as it is not itself illegal, will not be enforceable as a term of the employee's employment. While this might seem to

convey the attitude that an employer can get away with anything, market economics, along with labor laws and, in some cases, organized labor, will usually (it is hoped) prevent an employer from becoming too draconian in its policies. The fact remains, though, that human relations within a company are in constant flux. Be they good or bad in any particular company, it is not for a court of law to step in to what are, at bottom, private affairs, and however it feels about the particular policy under attack, it may not intercede merely because it would have done things differently. If existing labor laws are insufficient to guarantee equality between management and labor, Congress and the state legislatures constitute the branch of government which must be petitioned. It may be the better policy argument that federal discrimination laws are so important, and the right guaranteed thereunder so inviolate, that only courts of law, manned as they are by individuals trained in the law, should be able to settle disputes implicating such, but the Supreme Court has rejected that argument. *See Gilmer,* 500 U.S. at 29, 111 S.Ct. 1647; *Mitsubishi,* 473 U.S. at 628, 105 S.Ct. 3346. That being the case, until Congress acts to the contrary, employers may mandate that employees arbitrate such disputes.

## IV. *Conclusion*

Based on the reasoning and the citations of authority set forth above, the Court finds the Defendant's Motion to Dismiss and Compel Arbitration (Doc. # 7) well taken, and it is hereby SUSTAINED.[15] Because the arbitration provision at issue is binding, such that the Court will play no meaningful role in the resolution of the underlying merits, it shall dismiss the action in its entirety, rather than stay the

---

**15.** As noted *supra* note 5, while the Court sustains the Motion to Compel Arbitration, whether the parties should proceed immediately to arbitration or to some earlier stage of

proceedings pending the outcome of arbitration. *See Arnold,* 920 F.2d at 1276; *Orcutt,* 199 F.Supp.2d at 758.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

ACT is a decision which must be left to the parties themselves to determine, per the terms set forth in ACT.