**David R. STEPP, Plaintiff,**

v.

**NCR CORPORATION, Defendant.**

**No.  3:02CV203.**

United States District Court,
S.D. Ohio,
Western Division.

July 9, 2007.

David Donald Kammer, Tobias, Kraus & Torchia, Cincinnati, OH, for Plaintiff.

Timothy Robert Butler, NCR Corporation, Dayton, OH, Rebecca Beata Jacobs, Ulmer & Berne, Columbus, OH, Thomas H. Barnard, Jr. Ulmer & Berne LLP, Cleveland, OH, Defendant.

DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION TO DISMISS AND COMPEL ARBITRATION OR IN THE ALTERNATIVE STAY THE ACTION (DOC # 3); CONFERENCE CALL SCHEDULED TO ESTABLISH TRIAL DATE AND OTHER DATES

RICE, District Judge.

The question presented herein is whether an employer can enforce a mandatory arbitration policy imposed upon an at-will employee, where the employer had stated upon the initiation of the policy that the employee's continued employment with the company, along with the acceptance of any future pay raises, promotions, bonuses, and the like, would constitute his acceptance of that policy.

Plaintiff David Stepp was employed by Defendant NCR Corporation ("NCR"), beginning in July of 1968. In October of 2000, Stepp was removed from his position and the position was transferred to another part of the company. Plaintiff believed he would be transferred with the position, and applied for it when it was offered to the public. Plaintiff was informed he would not be transferred with the position, and he was neither interviewed for nor offered it. He was terminated on October 13, 2001.

Believing that the defendant's refusal to transfer him or to hire him into his old position, and his termination were due to age-based animus on the part of NCR, Stepp, who was 51 years old at the time he was terminated, brought the underlying Complaint (Doc. # 1), pleading therein three causes of action: (1) age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"); (2) age discrimination in violation of Ohio Rev.Code § 4112.14; and (3) age discrimination in breach of Ohio's public policy against the same.

Pointing to a binding arbitration agreement initiated by NCR in October, 1996, which listed disputes stemming from an employee's involuntary termination on its enumerated list of disputes subject to its provisions, NCR has filed a Motion to Dismiss and Compel Arbitration or in the Alternative Stay the Action (Doc. # 3), arguing that the Court should enforce Stepp's purported agreement to forgo litigation in favor of submitting his discrimination dispute to arbitration. Stepp, in his Memorandum in Opposition (Doc. # 13), raises five objections to NCR's argument that the arbitration agreement is binding upon him: (1) it is unenforceable because

no contract to arbitrate was ever formed; (2) it is unenforceable because NCR offered no consideration; (3) it is unenforceable because it contains a prohibitive fee-shifting[1] clause; (4) it is unenforceable because it is unconscionable; (5) and, it should not be enforced because it does not allow for the full vindication of Plaintiff's statutory rights. (Doc. # 13).

For the reasons which follow, the Court Defendant's Motion to Dismiss and Compel Arbitration, or in the Alternative, Stay the Action is OVERRULED.

## I. STANDARD FOR RULING ON A MOTION TO DISMISS AND COMPEL ARBITRATION OR IN THE ALTERNATIVE, STAY THE ACTION

■ It must be noted first that NCR's Motion is not one which comes within the ambit of Rule 12(b) of the Federal Rules of Civil Procedure, which allows a defendant to move to dismiss on, among other things, grounds that the court lacks subject matter jurisdiction or that the plaintiff's claim fails to state a claim upon which relief can be granted. Instead, the standard for ruling on NCR's Motion is defined by the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* ("FAA"), which provides that a party to an arbitration agreement, who is aggrieved by another party's refusal to submit an arbitrable dispute to arbitration, may petition any federal district court which would otherwise have jurisdiction over the underlying matter in order to compel arbitration. 9 U.S.C. § 4; *see also* 28 U.S.C. § 1331 (original federal question jurisdiction) & 28 U.S.C. § 1332 (original diversity jurisdiction). The FAA then contemplates a stay of the proceedings in

---

**1.** What Plaintiff refers to as "fee-shifting," will, from here on out, be called by the Court, "fee-sharing."

federal court, as compared to dismissal of the action, "until such arbitration has been had in accordance with the terms of the agreement." *Id.* § 3. However, where "the terms of the agreement" dictate that the arbitrator's decision is final and binding, the federal courts have held that dismissal is appropriate on that basis, once it has been determined that arbitration indeed must be compelled. *See, e.g., Arnold v. Arnold Corp.-Printed Communications for Business*, 920 F.2d 1269, 1276 (6th Cir.1990); *Orcutt v. Kettering Radiologists, Inc.*, 199 F.Supp.2d 746 (S.D.Ohio 2002).

## II. *FACTUAL BACKGROUND*

■ In evaluating motions or petitions to compel arbitration, courts treat the facts as they would in ruling on a summary judgment motion, construing all facts and reasonable inferences that can be drawn therefrom in a light most favorable to the non-moving party. *See, Raasch v. NCR Corp.*, 254 F.Supp.2d 847 (S.D.Ohio 2003). Accordingly, the Court will look to the pleadings and other documentation attached thereto by the parties to lay the factual foundation, and construe those facts, and reasonable inferences that can be drawn therefrom, in a light most favorable to Stepp.

Stepp began his employment with NCR in 1968. (Doc. # 3 at 1) On September 21, 2001, he was notified by NCR that his employment would be terminated effective October 13, 2001. (Doc. # 3 at 2). Several years earlier, in 1996, NCR mailed notices to all its employees in the United States that it had initiated an employment-dispute policy, under which certain workplace disputes were subject to mandatory arbitration. (Doc. # 3 at 2). NCR did not ask its employees for their express consent to this new policy. (Doc. # 3)

The official name of NCR's arbitration policy, which became effective on October 1, 1996, is Addressing Concerns Together ("ACT"). (Doc # 3, Ex. 2–3) ACT does not immediately require arbitration of a dispute, but, rather, requires the resolution of such to unfold pursuant to a three-stage sequence. The first stage contemplates an informal resolution of the employee's grievance, either with his manager or someone else in his chain of command, or with the Human Resources Department or some other confidential advisor, depending on the nature of the dispute. (Doc # 3, Ex. 1 at pp. 3–4) Stage 1 also contemplates that in instances of purported poor performance, an employee may be placed on a Personal Improvement Plan ("PIP"). (*Id.* at 4) The employee may appeal the PIP decision within 48 hours to the highest manager in his chain of command, but barring this manager's disapproval with the decision, he must comply. (*Id.*)

Stage 2 contemplates a written appeal of any Stage 1 decision, including any demotion or termination that results from an employee's failure to meet the terms of her PIP. (*Id.* at 5) The appeal is to be made to an NCR Leadership Team panel, which shall consist of the Senior Vice President of the Human Resources Department, the Senior Vice President of the Law Department, and the Senior Vice President of the division in which the employee works or had worked. (*Id.* at 5)

Finally, at Stage 3, ACT contemplates that any dispute not resolved at Stage 1 or 2 shall be submitted to an arbitration panel of the American Arbitration Association ("AAA"), to be conducted in a neutral location and in accordance with the rules of the AAA. (*Id.* at 5–6) The appealing employee may retain legal counsel, and is entitled to depose two lay individuals and any expert witness expected to testify at

the arbitration hearing. (*Id.* at 5–6) Filing and arbitration fees are to be shared equally, unless the arbitrator reverses the Leadership Team panel's decision, in which case NCR is solely responsible. (*Id.* at 5–6)

ACT expressly states that it applies to "concerns involving," among other things, "involuntary termination" and "treatment that is perceived as unequal or discriminatory." (Doc. #3 Ex. 3 at p. 4) With respect to Stage 3, the arbitration stage, it states:

> U.S. employees' agreement to all of the ACT policy provisions, including arbitration, will be expressed in one or more of the following ways, effective October 1, 1996:
>
> - By continuing employment with NCR
> - By accepting any transfers, promotions, merit increases, bonuses or any other benefits of employment[.] (*Id.*)

### III. *ANALYSIS*

As noted, Stepp has raised five objections to NCR's Motion to Dismiss and Compel Arbitration, all premised on arguments that ACT is invalid insofar as he and his discrimination claims are concerned. His arguments are that ACT: (1) is unenforceable because no contract to arbitrate was ever formed; (2) is unenforceable because NCR offered no consideration; (3) is unenforceable because it contains a prohibitive fee-shifting clause; (4) is unenforceable because it is unconscionable; (5) and, should not be enforced because it does not allow for the full vindication of Plaintiff's statutory rights. (Doc. #13). In this Analysis, the Court will first set forth the law on arbitration, and then will address in turn Stepp's objections to ACT's validity in relationship to his claims.

### A. *THE STATE OF THE LAW CONCERNING COMPELLED ARBITRATION*

At common law, parties to binding arbitration agreements could revoke their submission to same prior to any award being granted. *See Juhasz v. Costanzo,* 144 Ohio App.3d 756, 761 N.E.2d 679, 684–85 (2001); *Kelm v. Kelm,* 73 Ohio App.3d 395, 597 N.E.2d 535, 539 (1992). While arbitration awards were enforceable, *see, e.g., Brennan v. Brennan,* 164 Ohio St. 29, 128 N.E.2d 89, 94 (1955) (noting that binding arbitration awards were held enforceable in Ohio, except where obtained by fraud or the like, at least as far back as 1835), American courts in general demonstrated hostility toward ordering specific performance of an agreement to arbitrate, seemingly adopting a jealous notion held by the common law courts of England that arbitration agreements were nothing less than a drain on their own authority to settle disputes. *See Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 219–220 n. 6, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). As the Ohio Supreme Court stated in an early case:

> It is a well settled principle of equity jurisprudence that a Court of Equity will not force the specific performance of an agreement to refer any matter in controversy between adverse parties to arbitrators. Nor will they compel arbitrators to make an award. This doctrine is stated in 2 Story's Com. on Equity, 680. This principle was directly decided in the case of *Mitchell v. Harris,* 2 Vesey, Jr., 131, and in *Street v. Rigby,* 6 Vesey 817. The reason given for this rule is that Courts of Chancery will not aid parties in ousting, by their agreements, the jurisdiction of the ordinary tribunals of the country, established for the trial of causes.

*Conner v. Drake,* 1 Ohio St. 166, 168–169 (Ohio 1853).

In response to this general mood of American courts, Congress enacted the FAA "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). Section 2 of the FAA states in part that "a [written provision in any] contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has noted that the FAA promotes a " 'liberal federal policy favoring arbitration agreements,' " *Gilmer* 500 U.S. at 25, 111 S.Ct. 1647, 114 L.Ed.2d 26 (*quoting Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)), and that the statute's reference in section 2 to transactions "involving commerce" demonstrates Congress' intent "to exercise [its] commerce power to the full." *Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 277, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995).

In recent history, the Supreme Court has confirmed that the FAA can be invoked to enforce, pursuant to prior agreement, the arbitration of federal statutory claims, unless Congress has otherwise "evinced an intention to preclude a waiver of judicial remedies" for such, *see Gilmer,* 500 U.S. at 26, 35, 111 S.Ct. 1647, 114 L.Ed.2d 26 (holding specifically that disputes arising under the ADEA may be submitted to arbitration), and to enforce any arbitration agreement which may be contained in an employment contract, other than an employment contract involving transportation workers. *See Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 119, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001); 9 U.S.C. § 1 (expressly excepting from the FAA's reach "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce"). The arbitral forum must "allow for the effective vindication" of a plaintiff's statutory claim, *Floss v. Ryan's Family Steak Houses, Inc.,* 211 F.3d 306, 313 (6th Cir.2000), but "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 637, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).

■ The determinative factor of whether an arbitration provision can be enforced to settle a dispute is the existence of a contract between the parties demonstrating that they intended for such to be the case. *See Floss,* 211 F.3d at 314. That determination is made with reference to state-law contract principles. *Id.* (*citing Perry v. Thomas,* 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987)); *Orcutt,* 199 F.Supp.2d at 750–51. Courts will not enforce an arbitration agreement when the parties did not agree to the clause. *Ervin v. American Funding Corp.,* 89 Ohio App.3d 519, 625 N.E.2d 635 (1993); *Estate of Lola Brewer v. Dowell & Jones, et al.* Cuyahoga App No. 80563, 2002 WL 1454069 (Ohio App.2002).

## B. STEPP'S OBJECTIONS TO ACT'S VALIDITY

### 1. NO CONTRACT TO ARBITRATE WAS EVER FORMED

■ Stepp's first argument is that the arbitration agreement contained in ACT

cannot be applied to him because he never formed a valid contract with NCR to arbitrate disputes. (Doc. # 14 at 6–8). His argument is that he neither received nor read the ACT materials sent to him in the mail, and, therefore, no offer to enter into an arbitration agreement was made to him. (Id. at 7). The Court finds that a genuine issue of material fact exists as to whether Stepp ever received or read the ACT materials. If in fact Stepp neither received nor read these materials, than no offer to arbitrate was made to him, and no contract exists regarding arbitration between Stepp and NCR.

In order for a valid contract to exist, there must be mutual assent, an offer, acceptance and consideration; if there is no meeting of the minds, the contract has not been formed. *McCarthy, Lebit, Crystal & Haiman Co. L.P.A. v. First Union Management* (1993), 87 Ohio App.3d 613, 622 N.E.2d 1093; *Noroski v. Fallet* (1982), 2 Ohio St.3d 77, 442 N.E.2d 1302. NCR attempted to express its offer by mailing a copy of ACT to Stepp's home and posting a copy of ACT on the company's intranet. (Doc. # 3 at 2, Doc. # 16 at 16) By continuing employment with NCR, Stepp would indicate his acceptance of the offer. (Doc. # 3 at 4 Ex. 3) This is how NCR expressed the issue in its notice to its employees that it was initiating ACT:

> You will not be asked to sign anything in conjunction with this new policy. Instead, your agreement to all of the ACT policy provisions, including arbitration, will be expressed in one or more of the following ways, beginning October 1, 1996:
>
> • By continuing employment with NCR
>
> • By accepting any transfers, promotions, merit increases, bonuses or any other benefits of employment[.] (*Id.*)

Generally speaking, an offer to contract cannot be accepted by silence, unless one's silent acts demonstrate acceptance based on a past practice or course of conduct. For example, a newspaper delivery boy who, beginning one day, throws a paper onto the porch of a homeowner who has never before ordered the paper, along with a note stating that he will deliver a paper everyday and call upon the homeowner at the end of the month to collect a certain amount of money in exchange, cannot collect at the end of the month if the homeowner has refused to acknowledge the proposed bargain, by allowing the papers to accumulate on her front porch. That is, the delivery boy cannot rely on the homeowner's silence as an expression of acceptance (of the offer to provide a daily newspaper in exchange for money). *See generally,* 1 Corbin on Contracts, *supra,* § 3.18. On the other hand, if the homeowner picks up and reads the paper everyday, it is likely that a contract will be implied despite the lack of an expressed acceptance: the homeowner's acts constitute acceptance of the offer. *See generally, id.,* §§ 1.11 & 3.8.

NCR contends that Stepp accepted the arbitration agreement (i.e., agreed to be bound by the arbitration provision), by continuing in his employment with NCR and by accepting future promotions, pay increases, bonuses, and other benefits. Both of these "forms of acceptance" were set forth in the informational brochure distributed to him and other NCR employees. The potential defect in NCR's argument is that there is every reason to think that Stepp would have performed in identical fashion even had he not been made aware of ACT. Re-characterized in terms of offer and acceptance, the question is whether Stepp's act of continuing to work for NCR, after NCR stated that doing so would constitute acceptance of the new term of employment, demonstrates his assent to, or

acceptance of, same. The answer is "no." *But see, Raasch v. NCR Corp.*, 254 F.Supp.2d 847, 867(S.D.Ohio Rice, C.J., 2003).

In *Raasch*, the Plaintiff brought an age discrimination suit with claims and facts very similar to this case. In that case, as in this one, NCR moved to dismiss based on the binding arbitration agreement contained in ACT. In *Raasch*, Defendant's motion was sustained. However, in *Raasch*, the Plaintiff admitted in a sworn affidavit that he had received the ACT materials in the mail, had read them, and understood that "the only way to avoid its effect was to resign." *Id.* at 852. The Court ruled in *Raasch* that the Plaintiff's continued employment and acceptance of benefits was sufficient to indicate his acceptance of the offer contained in ACT, because he indicated he was "fully aware," that his continued employment indicated acceptance of the offer. *Id.* at 867. Though very similar to *Raasch*, the facts here are also very different.

As noted, NCR's offer (ACT) was delivered to Stepp through the mail, and by posting it on the company's intranet. In Ohio there is a presumption, called the "mailbox rule," that, once an item is mailed, it is presumed to be received in due course. *See Weiss v. Ferro Corporation* (1989) 44 Ohio St.3d 178, 542 N.E.2d 340; *Young v. Bd. of Review* (1967), 9 Ohio App.2d 25, 38 O.O.2d 36, 222 N.E.2d 789; and *Kimberly v. Arms* (1889), 129 U.S. 512, 529, 9 S.Ct. 355, 361, 32 L.Ed. 764. However, this presumption is rebuttable with sufficient evidence. *Id; See also, Rafalski v. Oates* (1984), 17 Ohio App.3d 65, 477 N.E.2d 1212; *Grant v. Ivy* (1980), 69 Ohio App.2d 40, 429 N.E.2d 1188 [23 O.O.3d 34]. Unchallenged, sworn statements that an item had never been received are sufficient to overcome the "mailbox rule" presumption. *See Rafalski v. Oates* (1984), 17 Ohio App.3d 65, 477 N.E.2d 1212; *see also Hayes v. Kentucky Joint Stock Land Bank of Lexington* (1932) 125 Ohio St. 359, 181 N.E. 542.

Here, Stepp, by affidavit, has made an uncontradicted, sworn statement that he never received the ACT materials in the mail, nor had he read them at any time. (Doc. # 14 at 4) Besides the evidence that the ACT materials were mailed to Stepp, NCR has presented no evidence that Stepp either received the materials mailed to him, or read the materials posted on the company's intranet. In fact, NCR admits to being unable to guarantee that Stepp either received or read the ACT policy. (Doc. # 16).

As previously stated, in evaluating motions to compel arbitration, courts treat the facts as they would in ruling on a motion for summary judgment, construing all facts and reasonable inferences that can be drawn therefrom in a light most favorable to the non-moving party. *See, Raasch*, 254 F.Supp.2d 847. Viewing the facts presented in the light most favorable to Stepp, the Court must infer that he can not have accepted NCR's offer to be bound by ACT because no offer was ever made to him. "Arbitration is a matter of contract and, in spite of the strong policy in its favor, a party cannot be compelled to arbitrate a dispute which he has not agreed to submit [to arbitration]." *Teramar Corp. v. Rodier Corp.* (1987), 40 Ohio App.3d 39, 40, 531 N.E.2d 721. Upon review, the Court finds that, taking all the evidence submitted in the light most favorable to the Plaintiff, there exists a genuine issue of material fact as to whether Stepp ever received and read the ACT materials and, therefore, whether a contract to arbitrate was ever formed. While this finding is sufficient for the Court to OVERRULE NCR's motion, the Court will now address Stepp's other claims in the event that evi-

dence is later introduced indicating that Stepp did in fact receive and read the ACT materials.

## 2. LACK OF CONSIDERATION OFFERED BY NCR

Stepp next argues that even if a contract existed to arbitrate his dispute, the contract would fail for lack of consideration. (Doc # 14 at 8–10). He argues that since the Defendant has reserved the right to change the agreement between them, no mutuality of obligation exists. (Doc. # 14 at 9). The Court finds that because NCR both reserved and exercised the right to unilaterally amend ACT, any contract involving it lacked mutuality of obligation.

■ The concept of mutuality of obligation requires that both parties to a contract be bound by its terms. *Raasch*, 254 F.Supp.2d at 855. "Stripped to its essence, the concept of 'mutuality of obligation' expresses the idea that 'both parties to the contract must be bound or neither is bound.'" *Helle v. Landmark, Inc.*, 15 Ohio App.3d 1, 472 N.E.2d 765, 776 (1984).

■ Despite the Defendant's assertion that it intended to be bound by the arbitration process, it has not bound itself to the contract of which the arbitration process is only one part. The arbitration agreement is part of the ACT Policy. NCR sought to incorporate all of the ACT policy into its purported contract with its employees. (Doc. # 3 at 4 Ex. 3). ACT is a part of NCR's Corporate Management Policy Manual ("CMPM").[2] (Doc. # 14 at 8). In addition to corporate policy, the CMPM contains provisions for allowing NCR, and subsets of NCR, to deviate from

the policies it adopts. (Collins Dep., Ex. # 2). The decision on whether to approve deviations from a policy is within the sole discretion of the "Head Coach" of the unit responsible for developing the policy. (Id. at 2). In addition, by NCR's own admission, it has altered the ACT policy, and the arbitration agreement, on several different occasions. (Doc. 16 at 5).

The Defendant contends that it has "strictly limited" the conditions in which it might modify or deviate from the ACT policy, and that these self imposed limits create a mutuality of obligation. (Id. at 6). To support this contention, Defendant relies on *Morrison v. Circuit City Stores, Inc.*, 70 F.Supp.2d 815 (S.D.Ohio 1999). However, *Morrison* is inapposite. The limits the defendant corporation placed on itself in *Morrison* were temporal; the defendant corporation could only change the agreement on one day each year, and one month's notice must be given to employees before any change to the policy was undertaken. *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 667 (6th Cir.2003). In *Morrison*, the Sixth Circuit noted that under Ohio law an arbitration agreement "... giving the employer the right to amend or terminate the arbitration program 'at any time,' lacked consideration because it 'neither offered a benefit to its employees nor incurred any detriment by modifying the terms of the employment relationship.'" *Id.* at 667 (quoting *Harmon v. Philip Morris, Inc.*, 120 Ohio App.3d 187, 697 N.E.2d 270, 272 (1997)).

Here, NCR has placed no such limits on its ability to alter or deviate from ACT. Further, the "limits" that NCR has purported to bind itself to are more in the

---

2. Generally an employment manual does not constitute a contract. *See, Rigby v. Fallsway Equip. Co., Inc.*, 150 Ohio App.3d 155, 779 N.E.2d 1056 (2002). However, an employer's promulgation of employment manuals, em-ployee handbooks or other writings styled "personnel policies and practices" can, in certain circumstances, create contractual rights. *Helle v. Landmark, Inc.*, 15 Ohio App.3d 1, 472 N.E.2d 765 (1984).

nature of suggestions than binding conditions. According to the limits referred to by the Defendant, some circumstances are "*generally* considered supportive of deviation requests," while others are "*generally* not considered supportive of a deviation request." (Doc. # 16, Collins Dep. Ex. # 2 at 1–3, emphasis added).

More informative is the Sixth Circuit's ruling in *Floss, supra.* In that decision, the Court concluded that an arbitration agreement was unenforceable in part because the employer could alter the applicable rules and procedures without any notice to or consent from employees. *Id.* at 315–316; *see also Dumais v. American Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002) (following *Floss*, and holding that where the employer retained the right to alter the arbitration agreement's existence or its scope, it is illusory and unenforceable); *Trumbull v. Century Marketing Corp.*, 12 F.Supp.2d 683 (N.D.Ohio 1998) (finding that no mutuality of obligation existed in arbitration agreement that was part of an employee handbook that employer could change at any time without notice to employees); *cf, Raasch*, 254 F.Supp.2d at 857 (noting that *Floss* was inapposite since the plaintiff had failed to direct the Court's attention to any defect in the ACT policy similar to the defects in the *Floss* arbitration agreement). Because NCR could and did alter the arbitration agreement contained in ACT without notice to, or consent from, employees, there was no mutuality of obligation, and thus no consideration and therefore no contract.

### 3. THE CONTRACT IS UNENFORCEABLE BECAUSE IT CONTAINS A PROHIBITIVE FEE–SHARING CLAUSE

Stepp next argues that by requiring him to bear half the cost of the arbitration, NCR has rendered the contract to arbitrate unenforceable. (Doc. # 14 at 10–12). "Where, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 92, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000). The provision that Stepp refers to is generally regarded as a fee-sharing provision, This Court examined this provision in *Raasch*, 254 F.Supp.2d at 857–861.

In *Raasch*, this Court adopted a rule requiring it to make a factual determination as to whether or not a Plaintiff can afford the arbitration fees which a fee-sharing provision imposes on him. 254 F.Supp.2d at 860. Stepp has provided no evidence to suggest he cannot afford the cost of arbitrating his dispute. (Doc. # 14 at 10–12). Absent such evidence, it is impossible for this Court to find that the fee-sharing provision contained in ACT is so expensive that it erects a prohibitive bar to Stepp's ability to vindicate his statutory rights.

### 4. UNCONSCIONABILITY

█ Stepp's fourth argument is that the arbitration agreement embodied in the ACT policy is unconscionable and therefore unenforceable. For support of his argument, Stepp relies on *Ferguson v. Countrywide Credit Indust. Inc.*, 298 F.3d 778 (9th Cir.2002). Because *Ferguson* relies on California law, it is not controlling herein. The difference can be quickly observed. Under California law, a contract to arbitrate between an employer and an employee raises a rebuttable presumption of substantive unconscionability. *See, e.g., Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1179 (9th Cir.2003). Ohio has no such presumption. The question here is whether the contract is unconscionable un-

der Ohio law. To establish that an agreement is unconscionable under Ohio law, Stepp must demonstrate both:

    a. *substantive unconscionability,* by showing that the contract terms are so unfair to one party that their enforcement would be unreasonable, and

    b. *procedural unconscionability,* by showing that there was an absence of meaningful choice or understanding of the terms on the part of one party.

*Raasch,* 254 F.Supp.2d at 860

### (1) *Substantive Unconscionability*

Stepp presents two arguments to support his claim that the arbitration agreement is substantively unconscionable. He contends that it requires employees to arbitrate the most common claims that employees bring, while it allows the employer to go to court to enforce the most common claims against employees. (Doc. # 14 at 13). To support this claim, Stepp merely references the list of claims that the arbitration agreement covers. (Id.). He presents no facts regarding the relative frequency of the claims covered by ACT, vis a vis the claims not so covered. Nor does he produce any evidence regarding which claims are more common to employees and which are more common to employers. Absent any factual showing, it is impossible for the Court to rule that, as a matter of law, the inclusion of some disputes instead of others in ACT is so unfair as to be unreasonable.

Stepp also contends that the fee-sharing provision renders the agreement substantively unconscionable. (Id.) Per the Court's earlier discussion of the fee-sharing provision, Stepp has failed to make a sufficient factual showing on this point to demonstrate that the fee-sharing provision is substantively unconscionable.

### (2) *Procedural Unconscionability*

■ In determining procedural unconscionability, Ohio courts look to "factors bearing on the relative bargaining position of the contracting parties, including their age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, and whether alterations in the printed terms were possible." *Cross v. Carnes,* 132 Ohio App.3d 157, 724 N.E.2d 828, 837 (1998). "The crucial question is whether 'considering his obvious education or lack of it, [he had] a reasonable opportunity to understand the terms of the contract ...?' " *Ohio Univ. Bd. Of Trs. v. Smith,* 132 Ohio App.3d 211, 724 N.E.2d 1155, 1161 (1999) (quoting *Williams v. Walker–Thomas Furniture Co.,* 350 F.2d 445, 449 (D.C.Cir.1965), and *Lake Ridge Acad. v. Carney,* 66 Ohio St.3d 376, 613 N.E.2d 183, 189 (1993)) (alterations in original). Unequal bargaining power alone is insufficient to find procedural unconscionability. *See Morrison v. Circuit City Stores, Inc.,* 317 F.3d 646, 666–67 (6th Cir.2003). The Plaintiff has again failed to provide sufficient facts for a full analysis of the question of procedural unconscionability.[3] Based on the evidence presented, this Court finds that ACT is neither substantively nor procedurally unconscionable.

### 5. *ACT DOES NOT ALLOW FOR A FULL VINDICATION OF STEPP'S STATUTORY RIGHTS*

■ Finally, Stepp claims that by requiring all arbitration proceedings be kept

---

**3.** While this point, especially, is made moot by the Court's earlier finding that there is a genuine issue of material fact regarding whether Stepp received or read the ACT materials, the Court addresses it in the event evidence is later introduced that would lead a finder of fact to conclude that Stepp was aware of the ACT policy.

confidential, ACT does not provide for full vindication of his statutory rights. (Doc. # 14 at 14–15). The Supreme Court addressed its acceptance of mandatory arbitration for statutory claims in *Gilmer v. Interstate/Johnson Lane Corp.* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). In *Gilmer*, the Court upheld the mandatory arbitration of claims under the Age Discrimination in Employment Act. *Id.* In permitting the compulsory arbitration of the statutory claims, the Court noted that "by agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than judicial, forum." *Id.* at 26, 111 S.Ct. 1647 (citations omitted). "So long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 637, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). Given that Congress provided for confidentiality in court mandated arbitration, 28 U.S.C. § 652(d)(1948), the inclusion of a confidentiality provision in ACT is not sufficient to overcome the "current strong endorsement," of arbitration. *See Gilmer*, 500 U.S. at 30, 111 S.Ct. 1647 (citations omitted).

## IV. *CONCLUSION*

Based on the reasoning and the citations set forth above, because there is a genuine issue of material fact as to whether any offer to arbitrate was ever received by Stepp, and because the contract to arbitrate lacked mutuality of obligation and thus, lacked consideration, the Court OVERRULES the Defendant's Motion to Dismiss and Compel Arbitration or, in the Alternative, Stay the Action. (Doc. # 3)

Counsel of record will take note that a telephone conference will be held at 8:15 a.m., Wednesday, October 6, 2004. During the conference call, the Court and counsel will set a mutually convenient trial date and other dates leading to the resolution of this litigation.